THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ODELL HUDDLESTON, Defendant-Appellant.

First District (3rd Division)   No. 86—1486

Opinion filed October 19, 1988.

Paul P. Biebel, Jr., Public Defender, of Chicago (Dennis E. Urban, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Judy L.

Groeneveld, and Holly E. Desnet, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE WHITE delivered the opinion of the court:

Following a jury trial, defendant, Odell Huddleston, was found guilty of voluntary manslaughter and sentenced to a prison term of six years. On appeal, defendant contends that: (1) the trial court improperly excluded evidence of the aggressive character of decedent, Dale Mangum; (2) the trial court erred in allowing the State's Attorney to "argue in closing argument that the defense failed to establish proof of matters which had been referred to during the defendant's opening" statement; and (3) the trial court improperly excluded the testimony of Robert Smith, a police officer, regarding the presence of stippling on decedent's clothing. We affirm.

Following is a summary of the evidence adduced at trial.

Defendant lived with his girlfriend, Margaret McIntyde, in a third-floor apartment at 5538 South Peoria, Chicago, Illinois. Margaret testified that on December 17, 1984, defendant returned home from work at approximately 8 a.m. He placed his gun in a trunk in the closet and locked the trunk. Margaret cooked some food for him. They were in bed when they heard Larky, Margaret's mother's boyfriend, and decedent knock on the door. Decedent identified himself, at which point Margaret told defendant that decedent was her brother and asked defendant to open the door. Margaret handed defendant his clothes and she opened the door. Decedent entered the apartment and sat on the bed. He had a bottle of Wild Irish Rose wine in his hands but he did not appear to be intoxicated. Margaret did not smell any liquor on his breath nor did she see him drink from the wine bottle. Decedent commented that the apartment was not a fit place to live because it had no heat, the building had rats and looked like it had been condemned. Decedent urged Margaret to leave with him. He told her about an apartment that was available for $160 per month. Defendant asked decedent where the apartment was located and decedent gave him the address. Margaret showed decedent the way to the bathroom, which was located outside the apartment. She returned to the apartment alone. Defendant told her that he did not believe decedent was her brother, he thought decedent was her "old man." Margaret told defendant that decedent was her brother. Margaret left the apartment and returned shortly with decedent. Decedent sat on a chair and Margaret sat on the bed. Defendant came out of the closet

with a gun in his hand. He told decedent "[G]et up, motherf----, and get on your knees. Walk slowly and get on your knees." Decedent rose from the chair, walked slowly, got down on his knees and raised his hands. Decedent did not have anything in his hands at this point. Decedent said "[O]h, no, man, don't do it, I got a wife and children, a family to raise." Margaret told defendant, "[T]hat's my brother, that's my old man, don't do it." Defendant shot decedent in the leg and under the arm. Defendant fired a second shot into the wall. Margaret ran downstairs to her mother's apartment. As she ran downstairs, she heard more shots. She told her mother that defendant "was fixing to kill Dale." Margaret went back to the third floor. She heard some bottles breaking. A neighbor on the third floor told her to go back downstairs, which she did.

Defendant was wearing a pair of jogging pants and shirt, gym shoes and a jacket identified as People's exhibit No. 6, when he shot decedent. Defendant did not have a cut on his arm prior to decedent's visit or while decedent was in the apartment. Margaret first saw the cut on defendant's arm after the police arrived.

Margaret further testified that she kept garbage in the garbage cans in the common kitchen. The common kitchen is located outside the apartment. The garbage had not been taken out for some time. When she went downstairs after the first shots, the garbage cans were standing in the kitchen. When she returned upstairs after the shooting, the garbage cans had been knocked over. There were no bottles or other garbage on the floor of the apartment when decedent arrived or at the time of the shooting.

Police officer Gerald Wesley testified that on December 17, 1984, at approximately 10 a.m., he responded to a radio assignment that a man had been shot at 5538 South Peoria. A two-story stone building with an attic is located at that address. On the outside, the building appeared abandoned or grossly neglected. Inside, the building smelled of garbage, with excrement and other garbage everywhere. Officer Wesley proceeded to the top level of the building. As he neared the top of the stairway, he saw decedent lying on the floor on his stomach, with his head facing the stairway and his feet pointed toward defendant's apartment. Defendant, Vera McIntyde, decedent's mother, and Margaret McIntyde were standing near decedent. Officer Wesley asked what happened, and defendant responded that he shot decedent because they had an argument. Officer Wesley asked defendant for the weapon. Defendant pointed to his apartment and said he was going to show Officer Wesley the location of the weapon. Officer Wesley entered defendant's apartment and defendant followed. Defendant

pointed to a stack of clothes and newspapers and told Officer Wesley that the weapon was under the stack. Officer Wesley removed the stack of clothes and newspapers and recovered a Tarus .38 caliber, six-shot revolver. The revolver contained six .38 caliber plus hollow point cartridges. Officer Wesley determined that the revolver had been fired recently and had also been cleaned.

Officer Wesley told defendant that he was under arrest and attempted to tell defendant his rights. Defendant told Officer Wesley that he knew his rights and quoted them verbatim. Officer Wesley then took defendant to the squad car. Defendant was wearing a blue sweatshirt and dark blue jogging pants. Once inside the squad car, Officer Wesley noticed that defendant had a cut on his left forearm. Officer Wesley asked defendant whether the Tarus .38 caliber revolver was the weapon that defendant had used in the shooting and why the revolver had been cleaned. Defendant replied that he always cleaned his weapon after shooting it.

At approximately 2 p.m., that same day, Officer Wesley returned to defendant's apartment and recovered a blue, waist-length jacket, People's exhibit No. 6. Officer Wesley did not see any cuts or slash marks on the jacket but he noticed what appeared to be bloodstains on the inside left sleeve of the jacket.

On cross-examination, Officer Wesley testified that Margaret McIntyde appeared upset at the scene of shooting. She was crying and sobbing uncontrollably. He did not ask her any questions. He did not speak to her. She did not tell him that she witnessed the shooting.

Officer James W. Washington testified that on December 17, 1984, he responded to a radio assignment of a shooting at 5538 South Peoria. He proceeded to the third floor of the building, where he saw decedent lying face down on the floor of the hallway. Defendant was standing in the hallway. Officer Wesley entered defendant's apartment and recovered a Tarus .38 caliber revolver which contained six live hollow point cartridges. Officer Washington then searched defendant's apartment using a flashlight and recovered three expended .38 hollow point cartridges.

The apartment and the hallway were a pigsty. The floor of the apartment was littered with bottles and other garbage. The hallway was littered with garbage, human waste and animal waste. The apartment had no heat and no working electricity. The only source of electricity seemed to be an extension cord running into the apartment, which was unplugged.

Officer Washington examined decedent's hair and clothing. He noticed that decedent had trash in his hair and on the front of his

clothes, from the top all the way down to the ankles. Decedent was then transported to the hospital.

Officer Washington noted that defendant was dressed in a blue jogging suit and had some cuts on his left arm. Defendant was not wearing a jacket.

Dr. John Rudzinski was qualified as an expert in the field of medicine. He testified that from the summer of 1984 until June 1985, he worked in the emergency room of St. Bernard's Hospital in Chicago. At approximately 2 p.m., on December 17, 1984, defendant arrived at the hospital complaining of cuts to his left arm. Defendant said that his left arm had been slashed with a wine bottle. Dr. Rudzinski examined defendant's left arm and observed half a dozen thin, straight, superficial cuts along the arm, in a well-delineated area. The cuts appeared to involve no major injuries to the nerves, blood vessels, tendons or muscles of the arm. The cuts were of a uniform direction and depth and did not contain any foreign bodies such as pieces of glass. They did not resemble cuts made by the jagged edge of a bottle. A cut made with a bottle is generally wider, more irregular and deeper, with gaping edges, and, often, pieces of glass embedded in the wound. Based upon these observations, Dr. Rudzinski was of the opinion that the cuts on defendant's arm were self-inflicted.

Detective Thomas O'Connor testified that he arrived at 5538 South Peoria at approximately 11 a.m., on December 17, 1984. He proceeded to the third floor of the building, where he observed decedent lying facedown near the stairway. Decedent's hair was dirty in one section and his clothing was soiled, especially at the knees. Detective O'Connor entered defendant's apartment, which consisted of one large room separated in two sections by a curtain or sheet. The first section of the room was the sleeping area and contained a couple of mattresses on the floor and a chair. There was debris centered in the middle of the sleeping area. The back section of the room was the kitchen area and contained a sink which did not work. There were broken bottles inside the sink but the kitchen area did not contain any other debris. There was a common kitchen outside the apartment with a garbage can lying on its side.

Detective O'Connor further testified that at approximately 2:45 p.m. that same day, he and Officer Dale Riordan interviewed defendant at the police station. Officer Riordan read the *Miranda* warnings to defendant. Defendant indicated that he understood his rights and gave three accounts of the shooting. In all three accounts, defendant stated that he returned home from work early in the morning. He was in bed when Larky Hudson knocked on the door announcing that

Margaret's brother had come to visit. Margaret opened the door and her brother entered. Larky did not come into the apartment. Margaret introduced her brother, Dale Mangum, to him. Dale wasn't pleased with the apartment and the conditions under which his sister was living. Dale wanted to take her away from the apartment.

At this point, the three accounts of the shooting digressed. In the first account, defendant stated that he asked Dale for a cigarette and Dale said he didn't have any. Margaret said that she would get some cigarettes and she went down to the second floor. He told Dale that he should leave if he didn't like the apartment. Dale responded that he would only leave with his sister. Dale then cracked a wine bottle and attacked him. Dale pushed him and he fell near his revolver. He grabbed the revolver and pointed it at Dale. He told Dale to drop the wine bottle. Dale hesitated and then attacked him with the wine bottle. Dale cut him on the arm with the wine bottle. He fired once and hit Dale in the leg.

In the second account, defendant said that he asked Dale for a cigarette and Dale said that he didn't have any. Margaret then went downstairs to get a cigarette. Dale said he was going to take his sister from the apartment. He got out of bed and told Dale to leave the apartment. Dale broke a bottle, attacked him and cut him on the arm. He fell down within an arm's reach of the revolver. He grabbed the revolver and shot Dale in the leg.

In the third account, defendant stated that he told Dale to leave. Dale attacked him. They scuffled. He fell to the floor, where he cut his arm on some broken glass. He reached over and grabbed his revolver. He told Dale to put his hands up and turn around. Dale attacked him again and he shot Dale in the leg.

All three accounts are consistent on the events that followed. Defendant said that Dale tried to leave the apartment. He followed Dale to the door. He wanted to hit Dale over the head with the gun. When he reached the door, Dale turned on him and he shot Dale in the chest. Dale fell on the floor. He called downstairs for help.

At approximately 4:30 that same afternoon, Detective O'Connor, Officer Riordan and Assistant State's Attorney Earl Grinbarg interviewed defendant. Defendant was advised of his rights by State's Attorney Grinbarg and he gave yet another account of the shooting. Defendant said that he had worked the previous night. He returned home at approximately eight o'clock in the morning. The apartment was cold. He took his security guard outfit off and changed into a blue jogging suit. He got into bed dressed in the jogging suit because the apartment was cold. A short time later, Larky Hudson knocked at

the door, announcing that he was there with Margaret's brother, who had come to visit. Margaret got up and opened the door. Her brother, Dale Mangum, came in. Larky left. Dale looked around the apartment and commented about the living conditions. Dale said his sister didn't have to live there. Dale was going to take her out of the apartment. Dale was drinking wine when he came in the apartment. He asked Dale for a cigarette and Dale said he didn't have any. Margaret said she would go down to the second floor to get some cigarettes and left the apartment. Dale continued to berate the apartment. He got out of bed and told Dale to leave. Dale said that he would not leave without his sister. Dale then attacked him. While they were fighting on the floor, he cut his arm on some glass. He saw the blood and got angry. He was able to get away from Dale and to grab the revolver. He told Dale to put his hands up and turn around. Dale attacked him again. He shot Dale in the leg. Dale then attempted to leave the apartment. He followed Dale to the door with the intention of hitting him on the head with the gun. At the doorway, Dale turned on him. He was afraid of losing the gun to Dale. He was afraid that Dale would overpower him and shoot him. He shot Dale in the chest. He called downstairs for help. Then he reloaded his weapon.

State's Attorney Grinbarg asked defendant whether he was wearing a blue jacket during the incident. Defendant replied that he was not wearing a jacket. Defendant could not explain the presence of the blood on the jacket. When asked about the debris on the floor of the apartment, defendant claimed that the bottles and other debris had been on the floor for a long time. State's Attorney Grinbarg asked defendant about the cut on his arm. Defendant explained that about a week before the incident he was playing football when he fell into some bushes and cut his arm. He developed a scab on his arm. Dale threw an unbroken bottle at him, striking the scab and causing it to open and bleed. He got his revolver and fired a shot into the floor. He fired a second shot, which hit Dale in the leg. He then followed Dale to the door to hit him on the head with the gun. He fired a third shot while standing at the door and hit Dale in the chest.

On cross-examination, Detective O'Connor testified that the police report which was prepared by Officer Riordan and signed by Detective O'Connor does not reflect that decedent's hair or clothing were dirty. Neither Detective O'Connor nor Officer Riordan asked defendant to execute any form acknowledging that the *Miranda* warnings had been given. No one took notes during the conversations with defendant or recorded the conversations in any way.

Dr. Tae An testified that he is employed by the Cook County med-

ical examiner as an assistant medical examiner. He is a pathologist in forensic pathology and board-certified in pathology and forensic pathology. On December 18, 1984, he performed an autopsy on the decedent. He observed seven bullet wounds on decedent's body. He assigned numbers to the bullet wounds. Wound No. 1 was an entry wound in decedent's left arm. Wound No. 2 was an exit wound in decedent's left arm, directly opposite to wound No. 1. Wound No. 3 was an entry wound on the left side of decedent's chest and could have been caused by the reentry of wound No. 2 bullet or by a new bullet. Wound No. 4 was an entry wound on the left side of decedent's abdomen. The bullet which penetrated through wound No. 4 exited through wound No. 5. Wound No. 5 was also the entry wound for a bullet in decedent's left buttock. Wounds Nos. 6 and 7 were made by the bullet which entered through Wound No. 5. The bullet which entered decedent's left arm had a rightward trajectory. The bullets which entered decedent's chest, abdomen and buttock all had downward trajectories.

Dr. An examined decedent's body for evidence of stippling. Dr. An defined stippling as tiny scratch wounds produced by gunpowder residue. Stippling is usually observed when the shooting range is 22 inches or less. Dr. An found no evidence of stippling on decedent's body.

It was Dr. An's opinion that decedent's death was caused by multiple gunshot wounds which resulted in internal injury.

On cross-examination, Dr. An testified that he examined decedent's clothing and did not find any stippling.

Police officer Robert Smith testified that he is employed by the City of Chicago as a firearms examiner in the crime laboratory. On December 18, 1984, he examined People's exhibit No. 13, a .38 caliber hollow point bullet, recovered from decedent's body by Dr. Tae An. He also examined a .38 caliber Tarus, which he identified in court as People's exhibit No. 4. He test-fired the Tarus using .38 caliber hollow point bullets and compared the spent bullets with the bullet recovered from decedent's body. In his opinion, the bullet recovered from decedent's body had been fired from the .38 caliber Tarus.

Domingo Overton, decedent's brother-in-law, testified for the defense. Mr. Overton resides at 5129 S. Halsted. On December 17, 1984, between 8:30 a.m., and 9 a.m., decedent visited him at home. At approximately 9:30 a.m., Mr. Overton and decedent left Mr. Overton's residence to visit Vera McIntyde, decedent's mother. On the way, they stopped at a liquor store where decedent purchased a pint of Wild Irish Rose wine. Decedent did not appear to have been drinking ear-

lier. He did not open the pint of Wild Irish wine or take a drink out of the bottle. He placed the bottle in the left pocket of his jacket. Mr. Overton and decedent continued to Vera McIntyde's home.

Dr. Michael Schaffer also testified for the defense. He is employed by the Cook County medical examiner as chief toxicologist. Dr. Schaffer interpreted the results of a gas chromatograph test performed on blood, urine and bile samples from decedent. Decedent's blood contained 239 milligrams per deciliter of ethanol; his urine contained 237 milligrams per deciliter of ethanol; and his bile contained 220 milligrams per deciliter of ethanol. In Dr. Schaffer's opinion, decedent was under the influence of alcohol at the time of his death.

On cross-examination, Dr. Schaffer testified that he did not perform the gas chromatograph test, and he had no independent recollection of the test.

Police officer Sharon Ellis-Williams was the third and final witness for the defense. She is employed by the City of Chicago in the crime laboratory division, serology section. She examined blood samples from defendant and decedent. Defendant has Type A blood. Decedent had Type B blood. She also examined bloodstains on the back and on the lining of a jacket belonging to defendant. She did not observe any cuts or slash marks on the left sleeve of the jacket. She performed certain chemical tests on the bloodstains on the jacket which revealed the presence of human blood, Type A and B activity. Type A and B activity may be caused by one person with Type AB blood or by two persons: one with Type A blood and one with Type B blood. Lastly, she performed tests on a jacket belonging to decedent. The tests revealed the presence of Type B activity and Types A and B activity. She could not tell how long the bloodstains had been on either decedent's jacket or defendant's jacket.

## I

At trial, the State's Attorney filed a motion *in limine* to exclude the testimony of police officer Richard Sullivan. Officer Sullivan had arrested decedent on a battery complaint filed by decedent's wife the night before the fatal shooting. The trial court granted the motion *in limine* and excluded the testimony of the officer. On appeal, defendant contends that the trial court erred in excluding the testimony of Officer Sullivan. Defendant maintains that Officer Sullivan's testimony would have created the inference that decedent, and not defendant, was the aggressor in the "altercation" between defendant and decedent. The testimony would have corroborated defendant's claim that he was acting in self-defense when he shot decedent.

The trial court held a hearing on the motion *in limine* at which Officer Sullivan testified as follows. Officer Sullivan was working without a partner on December 16, 1984. At approximately 9 p.m., he observed decedent walking on Lawrence Avenue in Chicago. Decedent was carrying a baby. Decedent's wife was approximately 20 feet away from decedent. She was yelling at decedent and waving at Officer Sullivan. Decedent was also yelling. Decedent and his wife appeared to be having a domestic argument. They also acted as if they had been drinking. Officer Sullivan approached decedent and requested that decedent give him the baby. After a couple of requests, decedent gave the baby to Officer Sullivan. Officer Sullivan asked decedent's wife why she wanted the police. She responded that she was having a domestic argument with decedent and decedent "hit her with his hand a couple of times and then took the baby from her, would not give the baby back." Officer Sullivan asked her if she was willing to sign a complaint against decedent and she said yes. Officer Sullivan then placed decedent under arrest for battery and transported him to the police station.

On cross-examination, Officer Sullivan was asked what he would have done had the baby not been present. He responded that if decedent and his wife had "persisted in their argument and there was no sign of any trauma to either party, [he] would have arrested both of them." Officer Sullivan did not see decedent strike his wife.

At the close of the evidence, the trial court commented:

> "There is no question that I would allow it in if the—if the victim here, Susan Mangum came here and testified that he struck me. There is no question that I would allow it to come in, if there was a conviction for a battery. But an arrest for a battery with a witness like this police officer coming into court and saying what he did, I believe the State's motion is correct."

We agree with the trial court's ruling. Defendant's attempt to introduce Officer Sullivan's testimony in evidence was for the purpose of showing that decedent had a violent character. However, the only evidence of decedent's "violent character" was a hearsay statement by decedent's wife that decedent struck her. Officer Sullivan did not see decedent hit his wife. He merely observed decedent and his wife yelling at each other. Yelling at another person is insufficient to establish a violent character. See *People v. Fischer* (1981), 100 Ill. App. 3d 195, 426 N.E.2d 965 (evidence that deceased became rowdy in a bar after having been refused a drink, and that he began pounding the bar and name calling, was not sufficient to establish that deceased was violent in nature).

Moreover, a mere arrest is not sufficient to establish that the person arrested actually performed any of the acts charged. (*People v. Halkens* (1944), 386 Ill. 167, 53 N.E.2d 923; *People v. Baer* (1976), 35 Ill. App. 3d 391, 342 N.E.2d 177.) Thus, Officer Sullivan's testimony that he arrested decedent on a charge of battery was not proof that decedent committed a battery and had a violent character.

■ We are mindful of our supreme court's ruling in *People v. Lynch* (1984), 104 Ill. 2d 194, 200, 470 N.E.2d 1018, that "when the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor." However, the victim's character must be shown by appropriate evidence. (*People v. Lynch*, 104 Ill. 2d at 200.) Proffered evidence will be excluded where it does not make the proposition that the victim was the aggressor more probable. (*People v. Florey* (1987), 153 Ill. App. 3d 530, 505 N.E.2d 1096; *People v. Fischer* (1981), 100 Ill. App. 3d 195, 426 N.E.2d 965; *People v. Baer* (1976), 35 Ill. App. 3d 391, 342 N.E.2d 177.) Officer Sullivan's testimony could not establish that decedent had a violent character and was properly excluded.

## II

Defendant next contends that the trial court compounded its "error" in excluding the testimony of Officer Sullivan by allowing the State's Attorney to argue in closing argument that the defense failed to establish proof of matters which had been referred to in the defense's opening statement. In opening statement, defense counsel told the jury the evidence would show that "while under the influence of liquor, [decedent] was arrested on the street here in Chicago on the signed complaint for battery by his wife, Susan Mangum." Defense counsel also stated that the evidence would show decedent "was belligerent and he was aggressive when he entered the apartment of Odell Huddleston" and decedent "was the aggressor."

We have already determined that the trial court did not err in excluding the testimony of Officer Sullivan. However, we will consider whether the State's Attorney's comments in closing argument constituted reversible error.

In closing argument, the State's Attorney remarked:

"And one of the things that the Judge is going to tell you is that the only things you can consider in this case are facts. My closing argument, my opening argument has nothing to do in this case as do any other arguments of counsel that you have heard. The only thing that you can consider in this case is the evidence that you have heard from that witness stand. *** And

in this case opening statements were made. And the attorneys have a right to make that statement to acquaint you with what they believe the law—that they expect the facts—they expect to prove in the particular case. However, any statements that are made in opening statements that were not proved you cannot consider as evidence. Anything that was promised, anything that was said that was not proved from that witness stand you may not consider and the Judge will instruct you that's the law *** ."

■■ ■ At the outset we note that these comments were not objected to at trial and any alleged error is waived unless it is "apparent that [the] error is so prejudicial that real justice has been denied or that the verdict of the jury may have resulted from the error." (*People v. Johnson* (1986), 114 Ill. 2d 170, 499 N.E.2d 1355, *cert. denied* (1987), 480 U.S. 951, 94 L. Ed. 2d 802, 107 S. Ct. 1618.) We do not believe that the State's Attorney's comments resulted in any prejudice to defendant, and thus reversal is not appropriate. (*People v. Bartall* (1983), 98 Ill. 2d 294, 456 N.E.2d 59; *People v. Carter* (1984), 129 Ill. App. 3d 1076, 473 N.E.2d 434.) It is proper for an attorney to give examples illustrating the application of the law to the facts, and where the attorney correctly states the law, there can be no prejudice to the opposing party. (*People v. Steffens* (1985), 131 Ill. App. 3d 141, 475 N.E.2d 606.) The State's Attorney's comments correctly stated the law that opening statements and closing arguments are not evidence.

■ An attorney may also comment upon opposing counsel's failure to produce evidence promised in opening statement so long as the comments do not reflect upon defendant's failure to testify. (*People v. Durso* (1968), 40 Ill. 2d 242, 239 N.E.2d 842; *People v. Ray* (1984), 126 Ill. App. 3d 656, 467 N.E.2d 1078.) The State's Attorney's comments were proper and did not cause prejudice to defendant.

### III

Defendant next contends that the trial court erred in excluding testimony of police officer Robert Smith regarding the presence of stippling on decedent's clothing. Officer Smith performed a dyphinlime test on decedent's clothing and concluded that stippling was present on the clothing. The trial court ruled that Officer Smith did not qualify as an expert and could not testify regarding the results of the test.

On appeal, defendant maintains that Officer Smith's "testimony would have created an inference that the deceased had been shot at

close range, and thus this tended to corroborate other evidence that a struggle occurred and that the defendant acted in self-defense." Defendant advances two arguments for reversal of the trial court's ruling: (1) the subject matter of Officer Smith's testimony "was not sufficiently beyond common experience so that it required the need that he qualify as an expert witness"; and (2) Officer Smith was competent to perform the test and should have been allowed to testify as an expert witness. We address each of these arguments in turn.

When a gun is discharged, soot, unburnt gunpowder, and, often, metal fragments are ejected with the bullet. (Bucklin, *Forensic Pathology*, Scientific & Expert Evidence 1165 (E. Imwinkelried 2d ed. 1981).) At very close ranges, from one-half inch to six inches, the gunshot wound is surrounded by or contains both soot and gunpowder marks. (Wecht & Perper, *Use of Forensic Pathology in Defending Criminal Cases*, Criminal Defense Techniques §67 (S. Bernstein ed. 1988).) Soot is not seen around the wound when the range exceeds six inches, while powder marks may be seen up to two feet. (Wecht & Perper, *Use of Forensic Pathology in Defending Criminal Cases*, Criminal Defense Techniques §67 (S. Bernstein ed. 1988).) The gunpowder marks consist of peppered-like, dotted bruises and/or abrasions called stippling and are produced by grains of burnt and unburnt powder striking the skin. (Wecht, *Use of Forensic Pathology in Defending Criminal Cases*, Forensic Sciences §25 (C. Wecht ed. 1988); A. Moenssens, F. Inbau & J. Starrs, Scientific Evidence in Criminal Cases 286 (3d ed. 1986).) Some of the grains of gunpowder are actually imbedded in the skin. (Wecht, *Use of Forensic Pathology in Defending Criminal Cases*, Forensic Sciences, at 25-27.) However, when the skin is covered by a layer of clothes, the grains of gunpowder may be deposited on the clothes and stippling may not be visible on the skin. A. Moenssens, F. Inbau & J. Starrs, Scientific Evidence in Criminal Cases, at 284.

The presence of stippling on the skin or on clothing is used to estimate the distance of the gun barrel from the skin. (Bucklin, *Forensic Pathology*, Scientific and Expert Evidence, at 1172.) Caution must be exercised, however, because the intensity and pattern of stippling varies not only with the range, but also with the type of gun, ammunition and gunpowder. (Wecht, *Use of Forensic Pathology in Defending Criminal Cases*, Forensic Sciences, at 25-28.) The exact range of fire can only be determined by using the suspected gun and similar ammunition to reproduce the stippling pattern found around the wound or on the clothing of the victim. Wecht & Perper, *Use of Forensic Pathology in Defending Criminal Cases*, Criminal Defense

Techniques, at 67—45.

■ Officer Smith's testimony was offered to show the presence of stippling on decedent's clothing and to corroborate defendant's claim that the shooting occurred at close range, during the course of a struggle. We are of the opinion that the presence of stippling on the body or clothing of a victim and the range at which a shooting occurred are matters beyond the realm of common experience. Thus, we agree with the trial court that Officer Smith could not testify regarding stippling on decedent's clothing, unless Officer Smith qualified as an expert in the area.[1]

■ We next consider defendant's claim that Officer Smith was competent to testify as an expert witness. In doing so, we note that an individual will be permitted to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of facts in reaching its conclusion. (*People v. Jordan* (1984), 103 Ill. 2d 192, 469 N.E.2d 569.) The burden of establishing the qualifications of an alleged expert is on the proponent of his testimony. (*People v. Park* (1978), 72 Ill. 2d 203, 380 N.E.2d 795.) Further, the degree and manner of knowledge and experience that is required of the alleged expert is directly related to the complexity of the subject matter and the corresponding likelihood of error by one insufficiently familiar therewith. (*People v. Park*, 72 Ill. 2d at 210; *People v. Columbo* (1983), 118 Ill. App. 3d 882, 455 N.E.2d 733, *cert. denied* (1984), 467 U.S. 1208, 81 L. Ed. 2d 351, 104 S. Ct. 2394.) The trial judge is afforded wide latitude in determining the admissibility of expert testimony, and his decision will not be overturned on review unless clearly and prejudicially erroneous. *People v. Columbo*, 118 Ill. App. 3d at 957.

Officer Smith testified at a hearing outside the presence of the jury. He performed a dyphinlime test on decedent's clothing on March 31, 1986, to determine whether the clothing contained unburnt grains of gunpowder. He had never performed a dyphinlime test prior to that date. He knew the type of test that he performed but he did not know "why things happened that did happen" because "he has not been trained" to perform the test. He did not prepare the chemicals for the test. He did not know what chemical reactions were involved in the test. He only knew that if the chemicals turned blue the test was positive for gunpowder. He followed an FBI manual in performing the test.

---

[1]We note that defendant has not cited, and we have not located, a single case where a lay witness was allowed to testify regarding the presence of stippling.

Officer Smith further testified that he does not have any training in chemicals. He has not taken any biology or chemistry courses. He has not written any papers or done any research regarding the test. He did not feel qualified to testify as an expert "because it's the first time I have ever performed it and I have not received formal training in it."

Twice in his testimony, Officer Smith spelled the name of the test that he performed: Dyphinlime. We have expended considerable time and effort to learn something of this test. Our research leads us to believe, however, that such a test does not exist.[2] This fact casts doubt upon Officer Smith's expertise and renders our task of determining the degree and manner of knowledge and experience that Officer Smith was required to have more difficult.

■ Officer Smith described the steps that he took in performing the test:

"What happened was an examination was made of the clothing with the steri-microscope which is a small, for convenience sake, portable-type microscope. And with the microscope you would take where you feel that it is a bullet hole in the clothing or a perforation. Okay. We don't know yet if it's a bullet hole or not. At the perforation, the steri-microscope you take and you look and you search, see if you can find anything that would be similar to maybe unburned grains of powder, such as gunpowder. When we took a tweezers, found a couple little flakes, took a tweezers and put it in a tray, a glass tray with a filament pa-

---

[2]Officer Smith apparently misspelled the name of the test that he performed. He may have performed a version of the diphenylamine paraffin test, or by other reference, a dermal nitrate test. The diphenylamine paraffin test is used to determine the presence of gunpowder residue on the hands of a suspect or victim. The test consists of making a paraffin cast of the hands and treating the inside area of the cast with drops of diphenylamine in a concentrated solution of sulphuric acid. If a reaction occurs in the form of dark blue pinpoint specks, it is considered evidence of recent gun firing. (A. Moenssens, F. Inbau & J. Starrs, Scientific Evidence in Criminal Cases, at 67—51.) The diphenylamine paraffin test, however, is not generally accepted in the scientific community because residue from products such as bleaching agents, chemicals, cosmetics, explosives, fertilizers and tobacco can trigger positive reactions. (S. Krishman, *Detection of Gunshot Residues on the Hands by Trace Element Analysis*, Scientific & Expert Evidence, at 315; Goldstein, Bidanset & Sale, *Scientific & Technical Defense & Investigative Techniques*, Criminal Defense Techniques §72.) The reliability of the test has also been questioned, and found wanting, by several courts. See *Brooke v. People* (1959), 139 Colo. 388, 339 P.2d 993 (the results of a paraffin test, rather than being placed in the category of the accepted tests, has the same reputation for unreliability as the lie detector test); *People v. Lofton* (1977), 45 Ill. App. 3d 157, 359 N.E.2d 498.

per in, put the chemical in and it turned blue and that indicates that it's gunpowder."

Officer Smith also testified that he was not familiar with the chemicals that he used and he has not taken any chemistry classes. Additionally, Officer Smith testified that he had not performed the test before and he has not been trained to perform the test. In light of these facts, we believe that the trial court did not abuse its discretion in excluding the officer's testimony.

■ Even assuming that Officer Smith should have been allowed to testify, any error in excluding his testimony was harmless. Officer Smith's testimony was intended to corroborate defendant's claim that he shot decedent in self-defense. However, defendant could not invoke the right of self-defense in the present circumstances.

Defendant made several statements to the police. In each statement certain details changed regarding the shooting. One series of events remained constant, however, in each statement: decedent was the initial aggressor; defendant shot decedent in the leg; decedent tried to leave the apartment; defendant followed decedent to the door so that defendant could hit decedent on the head with the gun; decedent turned toward defendant; defendant shot decedent in the chest.

■ The right of self-defense does not justify an act of retaliation and revenge. (*People v. Woods* (1980), 81 Ill. 2d 537, 410 N.E.2d 866; *People v. Thornton* (1962), 26 Ill. 2d 218, 186 N.E.2d 239; *People v. Dillon* (1962), 24 Ill. 2d 122, 180 N.E.2d 503.) Nor does it allow the pursuit and killing of even an original aggressor after the aggressor abandons the quarrel. *People v. Thornton*, 26 Ill. 2d at 222; *People v. Easter* (1981), 102 Ill. App. 3d 974, 430 N.E.2d 612; *People v. Hines* (1975), 31 Ill. App. 3d 295, 334 N.E.2d 233.

Thus, even if we accept defendant's version of the facts, he was not protected by the law of self-defense. Decedent abandoned the quarrel by attempting to flee the apartment. At that point, defendant became the aggressor by following decedent to the door with the intention of hitting decedent on the head. Defendant then shot decedent in the chest. Clearly, defendant could not invoke the right of self-defense to justify such actions.

For the aforementioned reasons, the judgment of the trial court is affirmed.

Affirmed.

RIZZI and FREEMAN, JJ., concur.