IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville January 27, 2009

## HARVEY L. WEBB v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2003-B-1445     Cheryl Blackburn, Judge**

_____

**No. M2008-00248-CCA-R3-PC - Filed March 11, 2009**

_____

The petitioner, Harvey L. Webb, appeals from the denial of his petition for post-conviction relief. In this appeal, he contends that he was denied the effective assistance of counsel. Discerning no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Trudy L. Bloodworth, Franklin, Tennessee, for the appellant, Harvey L. Webb.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Rob McGuire, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On June 7, 2004, a Davidson County Criminal Court jury convicted the petitioner, Harvey L. Webb, of the second degree murder of Simon J. ("Chief") Weaver, and the trial court imposed a sentence of 20 years' incarceration. This court affirmed the conviction and sentence on direct appeal, _see State v. Harvey Lillard Webb_, No. M2004-02805-CCA-R3-CD (Tenn. Crim. App., Nashville, Sept. 27, 2005), and our supreme court denied the petitioner's application for permission to appeal on February 6, 2006.

The evidence adduced at trial, as summarized by this court on appeal, established that on April 1, 2003, the victim and Steve Daniels confronted the petitioner about work the petitioner had completed on Mr. Daniels' car radiator. _Id._, slip op. at 1. When Mr. Daniels demanded a refund, the confrontation turned violent; however, "[b]eing outnumbered, the [petitioner] walked inside a house." _Id._

Two days later, Mr. Daniels met with the petitioner a second time, and the two reconciled. *Id.*, slip op. at 2. The petitioner told Mr. Daniels that "he was still mad at Chief." Later that same day, Mr. Daniels, while in the company of the victim, again encountered the petitioner on Lischey Street. *Id.* Mr. Daniels went into a nearby house while the petitioner and victim remained outside. When Mr. Daniels went back outside approximately ten minutes later, he saw the petitioner fire one shot at the victim, killing him. *Id.*

Derrick Booker confirmed the April 1, 2003 "scuffle" among the petitioner, Mr. Daniels, and the victim and stated that he overheard the petitioner threaten "to get Chief." *Id.* On the day of the shooting, Mr. Booker heard a gunshot, ran outside, and saw the petitioner walking away from the scene. *Id.* According to Mr. Booker, Mr. Daniels told him that the petitioner shot the victim. *Id.*

Five days after the shooting, the petitioner telephoned Detective Mike Roland and asked for a meeting "because 'he didn't do what everybody is saying he did.'" *Id.*, slip op. at 3. The following day, the petitioner met with the detective and signed a waiver of his *Miranda* rights before providing a videotaped statement, which was later played for the jury. *Id.* In his statement, the petitioner asserted that the victim and his companion, a man named Drew, threatened him with guns and that he fired a single shot in self-defense. *Id.*, slip op. at 5. The petitioner insisted that Drew fired several shots at him as he ran away from the scene. *Id.*

At trial, the petitioner testified that following the April 1, 2003 altercation, the victim, Mr. Daniels, and Mr. Booker "began riding by the [petitioner] as he was working on a car. As they rode by, they told him that they were going to get him for messing up [Mr.] Daniels' car." *Id.*, slip op. at 6. The petitioner denied shooting the victim and implicated Mr. Booker in the shooting, claiming that he encountered Mr. Booker on Lischey Street just after the shooting and that Mr. Booker "asked him what he saw and then threatened to kill him and his family." *Id.* The petitioner added that he had seen the victim and Mr. Booker "arguing about money and drugs on February 29th." *Id.* The petitioner blamed his false confession on a fear for his safety and the safety of his family members and "claimed that the self-defense theory was Detective Roland's idea." *Id.*

Ricky Moss corroborated the petitioner's testimony that he was not at the scene when the victim was shot. According to Mr. Moss, he and the petitioner were walking on Joseph Avenue when they "observed police cars going to the 'projects'" with their sirens on. *Id.* During cross-examination, Mr. Moss conceded that he was not certain of the date on which he and the petitioner walked down Joseph Avenue and saw the police cars "but insisted that it was around the time the shooting happened." *Id.*

Following the denial of his application for permission to appeal to our supreme court, the petitioner filed a timely petition for post-conviction relief, alleging that he was denied the effective assistance of counsel, that the evidence was insufficient to support his conviction, and that the "cumulative effect" of the errors at trial entitled him to post-conviction relief. An amended petition filed by post-conviction counsel alleged that the petitioner's trial counsel performed

deficiently by failing to request a bond reduction prior to trial, by failing to request the services of an investigator, by failing to request a "paraffin test" to determine whether the petitioner had recently fired a weapon, by failing to adequately consult with the petitioner, by failing to "obtain and review important evidence," by failing to call Ulysses Daniels and Christopher Bell as witnesses, by failing to conduct a redirect examination of the petitioner at trial, and by failing to subpoena witnesses to testify on the petitioner's behalf at sentencing.

At the September 26, 2007 evidentiary hearing on the petition, the petitioner testified that trial counsel failed to call witnesses that would have testified that he did not shoot the victim. He claimed that Ulysses Daniels and "two more ladies" whose names he had forgotten would have testified that he "was not the shooter and . . . wasn't in the alley at the time these police[] were there when the man got shot." He stated that he could not remember if he had provided trial counsel with Ulysses Daniels' legal name but confirmed that he provided counsel with his street name, which was "Pappy." The petitioner conceded that trial counsel informed him that the "two more ladies" "wouldn't help [him] at all. They would be mostly the State's witnesses," but he nevertheless insisted, "They would help my case tremendously, because they overheard conversations of Steven Daniels and Derrick Booker talking about what was going on before the shooting even happened." The petitioner admitted that he could not provide the names of either of the "ladies," but claimed that an investigator traveling the neighborhood on foot "[c]ould have gotten vital information for them to investigate."

The petitioner testified that he met with his trial counsel six times prior to trial but claimed that this was not a sufficient number of visits. He also stated that trial counsel went over the discovery materials with him but insisted that the discussion of these materials was not "meaningful." The petitioner testified that trial counsel also failed to obtain the security tapes from T & T Market and Last Chance Liquor Store, which, he claimed, would have shown that he could not have been at the scene at the time of the shooting.

The petitioner testified that the strategy employed by his trial counsel was different than the one they had agreed upon. Although he admitted that "the defense, it was good," he complained that trial counsel failed "to get [his] input on what was going on." He complained that counsel should have asked him questions on redirect examination to "[c]larify what was going on."

The petitioner also claimed that trial counsel should have acquired a videotaped interview of Steven Daniels. He conceded, however, that trial counsel had requested the tape from the State but "[i]t wasn't there." He stated that trial counsel also should have more thoroughly investigated Mr. Booker's culpability in the shooting.

During cross-examination, the petitioner acknowledged that he was arrested six days after the shooting and that he had washed his hands during the intervening period, but he nevertheless insisted that a paraffin test would have accurately indicated whether he had fired a weapon on the day of the shooting.

Trial counsel testified that he was appointed to represent the petitioner after the public defender's office developed a conflict of interest. He stated that the petitioner never asked that he make a bond reduction motion and that he did not file one of his own accord because he did not believe the petitioner would be able to make any bond the court would set in the first degree murder case. Counsel testified that the trial court approved funds for him to hire investigator Patrick Wells to assist in the case. He recalled the petitioner's asking for a paraffin test, but he stated that he "would not have entertained the idea" because at "the time it was requested would have been too long for the test to be meaningful."

Counsel testified that he met with the petitioner eight to ten times prior to trial and that Mr. Wells met with the petitioner on one occasion. Counsel stated that, based upon the petitioner's request, he attempted to secure Ulysses "Pap" Daniels as a witness but "he could not be located." He also testified that he attempted to secure the testimony of a woman who "lived on a corner that [the petitioner] referred to several times" but was unable to locate her. He stated that he chose not to call Mr. Bell for "a strategic reason."

Counsel testified that it was the petitioner's choice to testify at trial and that he chose not to conduct a redirect examination of the petitioner because the direct "examination did not go as [he] expected. And the cross[-]examination was worse." He stated that he "didn't want to beat a dead horse" and that "it was in [the petitioner's] interest . . . to[] just let it go."

Counsel testified that the petitioner was unable to provide the names of any potential witnesses for the sentencing hearing. He conceded that the petitioner was sentenced to 20 years, the midpoint within the range and the presumptive sentence at the time of the petitioner's trial.

On cross-examination, counsel admitted that Mr. Wells met only a single time with the petitioner but insisted that one meeting was sufficient. Counsel testified that he personally visited the crime scene but did not visit the T & T Market. He conceded that neither he nor Mr. Wells interviewed any individual at the market prior to trial. He stated that he could not recall whether he had checked to see if Ulysses Daniels was incarcerated but added, "[T]hat's something that Mr. Wells would normally have access to, as well." Counsel testified that he did not intend to present a theory of self-defense because the petitioner "was adamant that he was not the shooter." As a result, he filed a notice of alibi at the petitioner's request. Counsel reiterated that his decision to forego redirect examination of the petitioner was a strategic one, explaining, "I honestly didn't know what he was talking about on cross[-]examination. . . . But rather than hashing it out and making it worse than it was, I just decided to drop it." He added, "[M]y understanding of every discussion I ever had with [the petitioner] was that he . . . absolutely did not shoot this man. And then on cross, . . . he went into some type of explanation about how that I did what I had to do . . . and I just remember thinking, what is he . . . talking about?" Counsel testified that he spoke with the jurors after the trial and "they indicated, no, there was just no way that they were going to basically let [the petitioner] off of shooting that man."

At the conclusion of the hearing, the post-conviction court took the petition under advisement and, in a later-filed written order detailing its findings of fact and conclusions of law, denied post-conviction relief. The post-conviction court accredited trial counsel's testimony that he met with the petitioner eight to ten times and concluded that counsel adequately communicated with the petitioner before and during the trial. As regards the bond reduction motion, the post-conviction court accredited counsel's reason for not filing the motion and found that the petitioner had failed to establish prejudice. The court determined that "there was no basis for the [paraffin] test" because the petitioner "was not arrested until six days after the incident and trial counsel was not appointed to this case until months later." The post-conviction court concluded that the petitioner was not entitled to post-conviction relief on the basis that trial counsel had failed to call certain witnesses because the petitioner failed to present those witnesses at the evidentiary hearing. The court also found that trial counsel did not perform deficiently by failing to conduct a redirect examination of the petitioner at trial given trial counsel's testimony that he was surprised by the petitioner's testimony during cross-examination. Finally, the post-conviction court determined that the petitioner had failed to establish deficient performance based upon trial counsel's failure to obtain evidence from the T & T Market because the petitioner failed to present this allegedly exculpatory evidence at the hearing.

In this appeal, the petitioner contends that the post-conviction court erred by denying his petition for post-conviction relief. He asserts that he was denied the effective assistance of counsel at trial. Specifically, he claims that his trial counsel performed deficiently by failing to call Ulysses Daniels as a witness,[1] by failing to request a paraffin test of the petitioner's hands, by failing to obtain surveillance video from the T & T Market or Last Chance Liquor, and by failing to conduct a redirect examination of the petitioner at trial. The State submits that the petitioner has failed to establish his claim by clear and convincing evidence. We agree with the State.

The post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given were below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." *Strickland v. Washington*, 466 U.S. 668, 693 (1984). The error must be so serious as to

---

[1]At several points the petitioner's brief uses the names Ulysses Daniels and Steve Daniels interchangeably. The record establishes that Ulysses Daniels and Steve Daniels are two different people. Steve Daniels appeared at trial as a witness for the State, and the petitioner requested the testimony of Ulysses Daniels.

render an unreliable result. *Id.* at 687. It is not necessary, however, that absent the deficiency, the trial would have resulted in an acquittal. *Id.* at 695. Should the petitioner fail to establish either factor, he is not entitled to relief. Our supreme court described the standard of review as follows:

> Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component.

*Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

On claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

The petitioner claims that trial counsel was ineffective for failing to call Ulysses Daniels or two "ladies" as witnesses at trial. He also contends that trial counsel should have interviewed employees of the T & T Market and Last Chance Liquor Store because they could have provided exculpatory testimony. The petitioner failed, however, to present any of these potential witnesses at the evidentiary hearing. "When a [post-conviction] petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). If he fails to do so, he generally fails to establish ineffective assistance of counsel. *Id.* The post-conviction court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial. *Id.*; *see also Wade v. State*, 914 S.W.2d 97, 102 (Tenn. Crim. App. 1995).

Similarly, although the petitioner claims that trial counsel should have subpoenaed surveillance video from the two businesses, he failed to present the surveillance video at the evidentiary hearing or even establish that it existed. In consequence, he did not establish deficient performance.

The petitioner also contends that trial counsel performed deficiently by failing to request that a paraffin test be performed on his hands.[2] The post-conviction court specifically accredited trial counsel's testimony that he did not request such a test because it had been months since the shooting, thereby rendering any results suspect. The petitioner failed to contradict this testimony. He presented no evidence that a paraffin test would have been beneficial or that its results would have been admissible at trial. He is not entitled to relief on this issue.

Finally, the petitioner complains that his trial counsel performed deficiently by failing to conduct a redirect examination of him at trial. He claims that counsel could have used the opportunity to "clarify" that he was actually talking about the April 1, 2003 altercation rather than the April 3, 2003 shooting when he admitted shooting the victim in self-defense. Counsel testified that he was shocked by the petitioner's cross-examination testimony and that he chose to "let it go" rather than draw attention to it. The post-conviction court accredited the testimony of trial counsel and concluded that his decision to forego redirect examination of the petitioner qualified as a tactical decision. The record supports this conclusion.

Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

---

[2] The petitioner apparently refers to the diphenylamine, or dermal nitrate, test. As one court explained,

> The diphenylamine paraffin test is used to determine the presence of gunpowder residue on the hands of a suspect or victim. The test consists of making a paraffin cast of the hands and treating the inside area of the cast with drops of diphenylamine in a concentrated solution of sulphuric acid. If a reaction occurs in the form of dark blue pinpoint specks, it is considered evidence of recent gun firing. The diphenylamine paraffin test, however, is not generally accepted in the scientific community because residue from products such as bleaching agents, chemicals, cosmetics, explosives, fertilizers and tobacco can trigger positive reactions. The reliability of the test has also been questioned, and found wanting, by several courts.

*People v. Huddleston*, 530 N.E.2d 1015, 1025 (Ill. App. Ct. 1988) (citations omitted).