(No. 70985.─

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. AARON PATTERSON, Appellant.

*Opinion filed December 4, 1992.—Rehearing denied March 29, 1993.*

422

John D. Lien and Joan M. Kubalanza, of Foley & Lardner, of Chicago, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb and Carol L. Gaines, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Defendant, Aaron Patterson, was indicted, along with codefendant Eric Caine, for the murders of Vincent and Rafaela Sanchez, occurring during commission of a forcible felony (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(3)). Following a double jury trial in the circuit court of Cook County, defendant was found guilty and convicted. The trial proceeded to the death penalty phase, and the same jury found defendant eligible for the death penalty based on two aggravating factors, conviction of murdering two persons and killing in the course of another felony (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(b)(3), (b)(6)). The jury determined that there were no mitigating factors sufficient to preclude the imposition of the death penalty and the trial court sentenced defendant to death. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(g).) The death sentence was stayed (134 Ill. 2d R. 609(a)), pending direct review by this court (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603). We now affirm the conviction and sentence.

## BACKGROUND FACTS

The following facts were adduced at trial. On Saturday, April 19, 1986, Vincent Sanchez, aged 73 years, and Rafaela Sanchez, aged 62 years, were found stabbed to death inside their ransacked home, located at 8849 South Burley Avenue, Chicago. Forensic evidence established that the couple died as a result of multiple stab wounds consistent with infliction by either a hunting or butcher

knife. Their badly decomposed bodies were discovered after Wayne Washington, a 13-year-old youth who routinely performed odd jobs for the couple, alerted neighbors. Washington testified that he noticed that the rear door of the Sanchez residence was open and that the kitchen floor was bloody and so told a neighbor.

When police arrived, they were able to enter the home only by the rear door; the front door was barricaded and had numerous items in front of it. There was no evidence of forced entry. Vincent Sanchez was found lying in the bathroom and Rafaela was found on the dining room floor.

The kitchen, dining and living rooms of the residence were "a ransacked mess" with numerous objects, boxes, and papers strewn about and drawers and cabinets open. A police evidence technician testified that the home contained an excessive amount of used clothing, shoes, radios, etc. The second floor also contained a great deal of used, general merchandise.

A search of the residence by police uncovered four handguns from the bottom of a clothes hamper located in the dining room. Police recovered gun registration documentation for one of the guns from the pocket of Vincent's pants. Holsters and ammunition were also found in the residence.

Walter Collins, a police crime lab technician, testified concerning prints found at the scene. Collins testified that there were three footwear impressions of blood on the kitchen floor. There was also a single footprint impression of dirt with a minute amount of blood found on the back porch. A fingerprint was found on the exterior of the rear door to the home and a "multiple-type" palm print was found on the exterior of the bathroom door. Other prints were taken from two tape recorders, one of which was found on the back porch.

Rafaela's sister testified that she had last spoken to Rafaela the Wednesday before the victims' bodies were discovered. She believed that Vincent occupied his time by reselling items.

Following the police officers' discovery of the bodies, they questioned Washington. He told police that he saw Eric Caine and "DeEdward" "across from" the Sanchez residence which is located near Washington's school. Police located DeEdward and brought him to the police station for Washington to identify.

On or about April 21, 1986, police received information that defendant had told Marva Hall, DeEdward's cousin, that he, not DeEdward, had killed the victims. On April 30, 1986, defendant was found by police hiding in the attic of James Hill's home. Police were searching for defendant because they had a warrant for his arrest on an unrelated matter. After police found defendant, they transported him to the fourth district police station. Detective James Pienta testified that he had been looking for defendant in connection with the Sanchez murders and had spoken with defendant's father, a police sergeant. When Pienta learned that defendant was in custody, he and Detective William Marley, his partner, proceeded to the fourth district station and transported defendant to Area Two Violent Crimes headquarters, where he was questioned by the two officers.

According to police, defendant initially denied knowledge of the Sanchez murders. However, following the administration of a polygraph examination and further questioning, defendant admitted the murders to police and assistant State's Attorneys. Defendant and Caine were subsequently indicted for the murders. Before trial, defendant unsuccessfully moved for the suppression of his statements. Defendant and Caine were thereafter tried together by means of a "double jury" procedure.

## TRIAL

At trial, Marva Hall, aged 16 years, testified that on April 20, 1986, she saw defendant in a car with two other persons at 91st Street and Mackinaw Avenue. Hall had known defendant for three or four years and knew him to be a leader in the "Apache Rangers" street gang. According to Hall, defendant showed her a shotgun and a chain saw which were in the car and asked whether she knew anyone who wanted to buy the items. Hall testified that defendant told her that he had obtained the items from the elderly Mexicans who were "next to the old empty lot" and that he had stabbed them to death. Hall further testified that defendant told her that Michael Arbuckle and another person were with him at the time. Defendant also informed Hall that DeEdward, her cousin, had been taken to jail for killing "some white peoples," but that DeEdward had not killed them, he had. According to Hall, a few hours later, she saw De-Edward on the street. He had been held by police for several hours. The next day, Hall's mother-in-law called police. Shortly thereafter, Hall related to police what defendant had told her.

Under cross-examination, Hall agreed that when she was interviewed by Isaac Carrothers, a defense investigator, she denied that defendant had told her he committed the murders. Hall also agreed that during the interview with Carrothers, she denied telling the police that defendant committed the murders. According to Hall, she signed a statement to that effect, taken by Carrothers, because defendant had telephoned her from jail on four occasions and threatened to kill her if she appeared in court. Hall admitted, however, that she had never called the police concerning the threats and she did not tell Carrothers that she had been threatened. According to Hall, she was still afraid of defendant.

Carrothers testified that during the interview with Hall, she had not appeared frightened when signing the statement, nor had she told him of any threats by defendant. Rather, Hall had expressed to Carrothers that she was afraid of police. The trial court denied admission into evidence of Hall's signed statement taken by Carrothers.

Pienta testified that, after defendant was returned to Area Two following the polygraph examination, he confessed under questioning, relating the following. Before the murders, Caine approached defendant and said that he badly needed guns and assistance "on the street." Defendant and Caine knew that there were guns at the Sanchez residence and they decided to go there because Caine would be able to gain admittance to the Sanchez home. Defendant and Caine decided not to use a car driven by Caine, but walked down the Illinois Central railroad tracks. Defendant remained by a garage, while Caine went in the residence from the rear. While Caine was inside, defendant heard noise and Caine came running out, carrying a red bag containing a shotgun. They both fled.

According to Pienta, when he asked defendant to elaborate, defendant again related basically the same story, but added that he had been called into the Sanchez home, went in and, when the "old man" was taking too much time for the "good stuff," defendant had "c[o]me up like-up like a straight up Ninja" and "shanked him." Defendant then went on to relate that the woman started screaming and yelling, so he "shanked" her, also. Defendant said that "he had her springing everywhere." At the conclusion of this interview, Pienta went with other officers to locate Caine and he was brought back to Area Two where he was placed in a separate interview room for questioning.

Pienta further testified that during a later interview, in the early hours of the following morning, with Assistant State's Attorney Kip Owen present, defendant again related basically the same story. Defendant, however, added that he had entered the Sanchez residence armed with a revolver which did not work, but that "the old chump didn't know that." Defendant further added that he had obtained a knife from the kitchen and that Caine also had a knife. Defendant related that he had asked the old man for the "good stuff," but "that chump was too slow in getting it." Defendant again stated that he "came like a straight up Ninja," the "old man" was scared, tried to run and he "shanked him." He again stated as well that the woman started screaming, tried to run and he "shanked her, too." According to Pienta, defendant stated, more than once, "the bitch" and "I had her going everywhere." Defendant additionally claimed that Caine was a coward and had tried to stop defendant. Defendant took the knife with him as the two fled from the Sanchez residence and defendant tossed it on the railroad tracks. According to Pienta, defendant described himself as a "Ninja" and the "last apache." Pienta testified that these two interviews of defendant consisted primarily of defendant's narrative. Neither of the interviews was tape recorded, nor was a court reporter present.

Assistant State's Attorney Kip Owen testified that he was present at defendant's early morning interview. Owen corroborated Pienta's testimony regarding defendant's relation of events surrounding the Sanchez murders. Owen testified that defendant stated he "went Ninja" when events were happening in the Sanchez residence. Owen acknowledged that police conducted further investigation following defendant's statement by looking on the Illinois Central tracks for the knife, which was never found.

Peter Troy, a former assistant State's Attorney, testified that he interviewed defendant in the presence of Assistant State's Attorney Bill Lacy and Detective Madigan, during the afternoon of the next day. Troy testified that he explained to defendant both a court reporter procedure and a handwritten procedure for taking statements. Defendant agreed to give a handwritten statement and related the following to Troy.

Defendant, Caine and Michael Arbuckle, "Cochise," and someone named "Rambo" went on a "mission" to the Sanchez home. They went to the Sanchez home because there were guns and drugs there, which they intended to obtain. Defendant was armed with a .22-caliber pistol and a .38-caliber revolver. Defendant initially remained outside the residence, but then went inside when Caine took too long. Caine was asking Mr. Sanchez where the "stuff" was and Sanchez was responding "what stuff" when defendant stabbed Sanchez several times. Mrs. Sanchez began crying. Defendant got tired of her crying, grabbed her as she started to run and stabbed her. According to defendant, Caine left during the stabbing because he was "weak" and a "coward." Troy testified that defendant read a handwritten version of this statement but, after making several phone calls to family and an attorney, declined to sign it.

Michael Chambliss, an assistant medical examiner, who performed autopsies on the victims' bodies, testified as an expert in the field of forensic pathology. Chambliss testified that certain stab wounds to the bodies, which he termed "defense wounds," were consistent with the process of warding off an attacker. Rafaela's body was in a moderate to severe state of post-mortem decomposition; Vincent's was in a moderate to advanced state of decomposition.

Police officer Thurman Kluth, a latent fingerprint examiner, testified that both the palmprint located on the

exterior bathroom door and the fingerprint on the rear door belonged to Vincent Sanchez. The fingerprint from one of the tape recorders was determined to be neither the victims', Washington's, Caine's nor defendant's.

Detective William Marley testified for the defense, corroborating Pienta's testimony that he was present during the early morning interview between defendant and Owen. Marley acknowledged that after defendant gave his statement, Owen had wanted additional investigation done by police.

Carlton Ford testified for the defense, also, that in the latter part of April 1986 he, defendant and Steve Weathersby were driving around in Ford's mother's car, trying to sell a power saw which belonged to Weathersby. The three youths wanted to sell the saw in order to obtain money for liquor. According to Ford, there were no shotguns in the car, nor did Ford give the car keys at any time to either Weathersby or defendant or see them put anything in the trunk of the car. Ford testified that he obtained the saw and then picked up the car from his mother. The trio saw Hall around Houston Street and defendant asked her if she knew anyone who would want to buy the saw. Defendant spoke to Hall while seated in Ford's vehicle and also asked her if she knew whether some other unidentified individual was around. Ford further admitted that he and defendant had been members of the Apache Rangers.

Sharon Haynes, defendant's former girlfriend, testified that on April 17, 1986, at around 7:15 p.m., she arrived at a friend's house where defendant was asleep, presumably drunk. Haynes tried to awaken defendant, but could not and so she left the residence to go to a bus stop. When no bus arrived, Haynes returned to the friend's residence and successfully awakened defendant. Then they went into another room, lay down on a couch and went to sleep for the entire night.

Following closing arguments, the jury found defendant guilty of the murders of Vincent and Rafaela Sanchez. Defendant was subsequently sentenced to death.

## DISCUSSION

Defendant raises numerous issues concerning pretrial, trial and sentencing matters.

## I

### Motion To Suppress Statements and Voluntariness of Defendant's Confession

Defendant maintains error based upon a denial of a motion to suppress statements. Defendant raises five related issues. We first consider defendant's contention that the standard of proof establishing a confession as voluntary should be proof beyond a reasonable doubt rather than by a preponderance of the evidence.

This court has consistently held that the State has the burden of establishing the voluntariness of a defendant's confession, and the applicable standard requires proof by a preponderance of the evidence. (*People v. Caballero* (1984), 102 Ill. 2d 23, 33; *People v. King* (1986), 109 Ill. 2d 514, 525; *People v. Redd* (1990), 135 Ill. 2d 252, 292; see also Ill. Ann. Stat., ch. 38, par. 114—11, Committee Comments—1963 (Smith-Hurd 1977); *People v. Thomas* (1990), 137 Ill. 2d 500, 516.) Defendant argues that a confession has such profound impact on a jury that allowing this standard of proof in a circumstantial evidence case with no eyewitnesses amounts to proof of guilt by a mere preponderance of the evidence. According to defendant, application of this lower burden of proof in determining a confession's voluntariness, thereby, violates due process. We disagree.

Regardless of the standard of proof in determining a confession's voluntariness, the trier of fact must be convinced of guilt beyond a reasonable doubt based on all the evidence. While a confession may be the " 'most probative and damaging evidence that can be admitted' " against a defendant (see *Arizona v. Fulminante* (1991), 499 U.S. 279, 296, 113 L. Ed. 2d 302, 322, 111 S. Ct. 1246, 1257, quoting *Bruton v. United States* (1968), 391 U.S. 123, 139, 20 L. Ed. 2d 476, 487, 88 S. Ct. 1620, 1630), it remains, nonetheless, but one piece of evidence in an entire circumstantial evidence case. Thus, we are not prepared to say that in such cases the trier of fact finds guilt based upon merely a preponderance of the evidence. A defendant's due process rights are not violated by application of this standard of proof to determine the voluntariness of his confession, and we decline to adopt a standard based on proof beyond a reasonable doubt.

Defendant additionally contends that: (1) his confession was coerced and thus its admission violated the fifth amendment privilege against self-incrimination (U.S. Const., amend. V); (2) the erroneous admission of his confession was not harmless error; (3) the State failed to meet its burden of establishing the voluntariness of his confession because the State did not call all material witnesses to the surrounding circumstances or explain those witnesses' absence; and (4) the trial court failed to examine the totality of those circumstances because it did not consider evidence of certain written statements which defendant made at the time of his custodial interrogation.

## State's Witnesses' Testimony

Pienta testified that on April 30, 1986, at around 6:30 p.m., he and Marley transported defendant from the fourth district to Area Two. At the time, the officers

spoke to defendant and read him *Miranda* warnings. Defendant denied knowledge of the murders. Sometime between 7:30 and 9 p.m., the officers took defendant to downtown police headquarters, at 11th and State Streets, for a polygraph examination. After the examination, the officers proceeded to transport defendant back to Area Two and did not speak to him. Defendant, however, told them that he was hungry so they stopped at a McDonald's to get him food.

Pienta testified that, after they arrived at Area Two, he again read defendant his *Miranda* warnings and talked with him at around 10 p.m. for about one-half hour to 45 minutes. Marley was also present. According to Pienta, at around 1 a.m., he again spoke with defendant after reading him *Miranda* warnings for the third time. Marley and Assistant State's Attorney Owen were present at this interview. Detective William Pederson came in and out of the room during the interview.

According to Pienta, throughout this entire period, defendant never asked for an attorney or his father, nor was he threatened, told that he was lying, subjected to physical abuse or made to drink alcohol. Pienta denied that officers placed a plastic bag over defendant's head or slapped another person in defendant's presence. Under cross-examination, Pienta acknowledged that the supplemental police report which he had prepared concerning defendant's questioning did not reflect each instance that defendant received *Miranda* warnings.

Detective William Marley testified, essentially confirming the testimony of Pienta. Marley also testified that defendant never requested an attorney during a later interview concerning a separate offense as well as during his several interviews concerning the subject offense. During cross-examination, it was revealed that Detective Pederson had accompanied Marley and Pienta

when they had first transported defendant from the fourth district station to Area Two.

Detective Pederson testified confirming Pienta's testimony that he was not present during the entire interview of the defendant at 1 a.m., but went in and out of the interview room. Pederson also confirmed the prior testimony of Pienta and Marley to the effect that defendant was not abused or threatened.

Detective Daniel McWeeny testified that at about 5:15 a.m. on May 1, 1986, he and Owen interviewed defendant at Area Two about an unrelated case. Owen gave defendant *Miranda* warnings and then both McWeeny and Owen spoke with him for approximately 15 minutes. Defendant was not handcuffed. Neither did defendant ask to speak with an attorney. McWeeny essentially confirmed Pienta's testimony that defendant was not threatened, accused of lying, given alcohol to drink, or made to suffer a plastic bag being placed over his head while the lights were turned off.

Sergeant Raymond Madigan also testified. Madigan related that during the afternoon of May 1, 1986, at approximately 2:45 p.m., he was present with two assistant State's Attorneys and defendant in an interview room at Area Two. One of the two attorneys gave defendant his *Miranda* rights and defendant was questioned for 10 to 15 minutes. Madigan subsequently left the interview room and the two attorneys remained with defendant in the room for about 15 to 20 minutes. Around 4 p.m., defendant was again interviewed by these same individuals for about 45 minutes. Defendant was given *Miranda* warnings by one of the assistant State's Attorneys. Madigan also testified that Pienta, McWeeny, and Marley were never present during any interview of defendant in which Madigan was engaged. Madigan also confirmed the previous witnesses' testimony that defendant was not abused.

Assistant State's Attorney Peter Troy testified that he and Assistant State's Attorney Bill Lacy were the attorneys present with Madigan during the two afternoon interviews of defendant. Troy gave defendant his *Miranda* warnings during the first interview. The initial conversation lasted about 30 to 45 minutes. After defendant gave his oral version, Troy asked Madigan to leave the room and he and Lacy talked with defendant. Troy testified that he asked defendant how he was being treated by police and defendant responded that he was being treated "fine." Defendant indicated that he had eaten and had coffee. Upon being asked, defendant also indicated that no promises or threats had been made and that what he related was "the truth." After asking defendant whether he would give a court-reported statement, Troy left the room.

Troy testified that during the second interview, he asked defendant if he would be willing to give a hand-written statement. Troy explained the procedure to defendant and defendant agreed to give such a statement. Troy then questioned defendant and wrote out the statement. After the statement was completed, defendant read it aloud, but could not decide whether to sign it, as requested by Troy. Defendant was allowed to telephone his grandmother and an attorney about what he should do, but after the telephone calls, he was still undecided. Troy also confirmed the previous testimonies that defendant had not been threatened, abused, or refused access to his father or a lawyer.

Clarence Spivey, a paramedic assigned to do physical examinations of new inmates entering Cook County jail, testified that on May 2, 1986, he took a physical history from defendant. At the time, defendant did not complain of any physical injuries, but stated that his health was good. Spivey examined defendant and found no evidence of injury.

## Defendant's Testimony and Evidence

Defendant testified that on April 30, 1986, at approximately 3:15 p.m., he was arrested at James Hill's home by three police officers and taken to the fourth district station. Officer James Jackson, one of the arresting officers, read defendant his *Miranda* warnings. According to defendant, he remained at the fourth district for a few hours and he and Hill were then taken by Marley, Pederson and Pienta to Area Two.

According to defendant, on the way to Area Two, Pienta slapped Hill across the face. Pienta then turned toward defendant and told him that if the three officers had found him, they would have killed him. Defendant stated that after arriving at Area Two, he was taken to a second-floor interview room and his right wrist was handcuffed to a ring on the wall. Neither of the three officers advised defendant of his *Miranda* rights. At around 7 p.m., the three officers took defendant to downtown police headquarters.

Upon their return to Area Two, around 10 p.m., defendant was again placed in the second-floor interview room and one wrist was handcuffed to the wall. At this time, defendant told the three officers that if they were not going to charge him, then they should return him to the fourth district or take him to the Cook County jail for his other cases. Defendant also told them that if they were going to keep him, then he wanted a lawyer. Pienta responded by telling defendant that he was defendant's lawyer and that defendant was going to do what he was told to do.

According to defendant, from that point on, "a lot" of derogatory statements were made by Pienta and Marley. At around midnight, Pienta allegedly said, "I don't know about the rest of you, but I am tired of listening to this bull----, I am about ready to kick his ass." Marley,

however, allegedly assured Pienta that defendant would cooperate and asked defendant if that were so. Defendant responded by saying, "No, we don't have to go through that, I just told you that I didn't have anything else to say and that I wanted a lawyer." Pienta then left the room. The other two officers, however, remained in the room. When Pienta next entered the room, "he had like a manilla folder, and behind the manilla folder he had a gray plastic like wrapped up like a newspaper more or less." The plastic looked liked a typewriter cover.

Four additional officers then entered the room and began questioning and verbally harassing defendant. Pienta approached defendant and placed a second pair of handcuffs on his arms so that they were together behind his back and cuffed to the wall. Pienta then put his hand around defendant's neck and asked defendant whether he would cooperate, slapping defendant across the chest with his hand in a half-fist. The other officers, standing around the room, closed the door and turned off the lights. Pederson, who had been sitting behind a desk, reached for the plastic and placed it over defendant's face while the remaining officers hit, kicked, held and restrained defendant. Defendant was hit at least four or five times in the chest and stomach. He was not hit in the back, arms, or face. The plastic was held over his face for about one minute. When they removed the plastic and the lights were turned on, the officers returned to their former positions about the room. Pienta threatened more abuse unless defendant cooperated. Defendant again requested to speak with a lawyer, but was told that "you are not getting an m.f. attorney."

Defendant was asked again whether he would cooperate and he responded that he had said all that he was going to say. The group of officers then repeated their previous abusive activities, holding the plastic over

defendant's face for about two minutes, until finally defendant said, "Okay, anything you say." Defendant agreed with the officers' "theory about what happened" because every time he said he did not do "it" he had to "go through a major change of getting hit, or getting plastic put on [his] face." The additional four officers then left the room and only the original three remained.

When defendant asked for something to drink because he felt "choked," one of the officers exited and returned with brown liquid in a cup. Defendant believed that Marley was the officer. Defendant asked what the liquid was and was told that he was lucky because it was bourbon. Defendant would not drink the liquid. Then he placed the cup on the table and again asked for water. The officer then handed defendant the cup and encouraged him to drink, so he did.

The three officers then told defendant that the State's Attorney was coming and they wanted him to say that he had killed the Sanchezes. After removing defendant's handcuffs, all the officers left the room. Defendant saw a paper clip on the table, took it and scribbled something on the bench where he sat which was attached to the wall. He was alone in the room for about one hour.

Owen and a red-haired officer subsequently entered the room. Defendant asked whether it was possible for the officer to leave so that he could talk to Owen alone. The officer left. Owen told defendant that he had been advised by police that defendant wanted to give a statement. Defendant responded that he had nothing to say, that he had previously asked police for a lawyer, but they had not provided him access and so he was now requesting one. Owen then walked to the door, told the red-haired officer that defendant did not want to make a statement, but wanted to speak to a lawyer, and left.

About one minute after Owen left the room, the red-haired officer re-entered and threatened defendant by telling him that unless he cooperated he would be subjected to greater abuse. The officer then laid his gun on the table and continued to tell defendant that he was going to cooperate. Defendant was not handcuffed at the time. The officer also told defendant that "it is your word against our word. And who are they going to believe, you or me[?]" Defendant asked to make a phone call and asked for a lawyer, but the officer told him "nope" and left the room.

Another officer came into the room immediately after the red-haired officer left and handcuffed defendant's right wrist to the wall. About an hour or two later, a couple of officers came into the room with photographs and defendant identified Caine. About an hour or two later, the police brought Caine past the door of the interview room and asked defendant whether he knew Caine.

Defendant testified that it was early in the morning by this time. Madigan entered the room first and threw an "Egg McMuffin" at defendant, who had been yelling for someone to come because he wanted to go to the bathroom. Assistant State's Attorney Troy arrived and he and Madigan interviewed defendant. When defendant asked for a lawyer or to be allowed to talk to his father, Troy said it would not be necessary. Troy related the police version of events, telling defendant that he was there to help defendant and that all defendant had to say was that he killed the Sanchezes, sign a statement and he could leave. No written statement was then before Troy.

Troy then left the room, said that he would prepare the statement and all defendant had to do was to sign it. Troy also told defendant that Caine had given a statement implicating defendant and that all defendant had to do was give a similar statement against Caine. Defend-

ant then reiterated that he had nothing to do with the murders and still wanted a lawyer. Troy then agreed to work out a "deal" whereby defendant could call someone after he signed the statement. Defendant told Troy that he should let him make a phone call and then he would agree to do whatever Troy requested. Troy was reluctant, but then finally agreed provided defendant promised to sign the statement.

Defendant was then allowed to make a phone call in another room. However, when he attempted to call information for the telephone number of an attorney he was familiar with, Troy took the phone from defendant's hand and asked whether defendant was ready to do what he had been asked to do. Defendant said that he needed to make one more phone call so Troy relented and allowed him to do so. Defendant called his grandmother, but Troy again took the phone from defendant's hand and told defendant to tell his grandmother that he had killed two people.

After the phone calls, defendant was taken to another interview room. Troy came into the room about an hour or two later and ordered defendant to sign the statement. When defendant refused to sign and told Troy that he had lied when he previously agreed to sign, Troy became angry and choked and kicked defendant. Defendant again refused to sign the statement, said that he did not do "it," and Troy left the room.

On direct examination, defendant testified that when the three officers left him, which was after he was offered the liquid, he had one handcuff on his right wrist. When he talked with Owen, he had on one handcuff. When the red-haired officer spoke to him, he either had one handcuff on or they were both off. Defendant recalled testifying on direct that he was not handcuffed when talking with the red-haired officer. Defendant then agreed that the red-haired officer placed the gun on the

table between them and that defendant did not have on any handcuffs. Defendant also testified that he was speaking with the attorney when Troy took the phone.

The trial court subsequently denied defendant's motion to suppress statements on the basis of this evidence.

" 'Whether a statement is voluntarily given depends upon the totality of the circumstances. The test of voluntariness is whether the statement was made freely, voluntarily and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he confessed.' " (*People v. Redd* (1990), 135 Ill. 2d 252, 292, quoting *People v. Clark* (1986), 114 Ill. 2d 450, 457; see also *People v. Thomas* (1990), 137 Ill. 2d 500, 516.) Factors to be considered in making the determination include the age, education and intelligence of the accused, the duration of the questioning, whether he received constitutional rights or was subjected to any physical punishment (*People v. Martin* (1984), 102 Ill. 2d 412, 427), or whether promises of reward were made or rudimentary necessities of life were disregarded by authorities (*People v. Jackson* (1968), 41 Ill. 2d 102, 110).

The voluntariness of a confession, under ordinary circumstances, only needs to be established by a preponderance of the evidence. (*Clark*, 114 Ill. 2d at 457, citing *People v. Jackson* (1968), 41 Ill. 2d 102, 109; see also *Redd*, 135 Ill. 2d at 292.) The burden is upon the State to establish that the confession was voluntary, and upon the establishment of a *prima facie* case, the burden of going forward with proof properly shifts to the accused. See *People v. King* (1962), 24 Ill. 2d 409, 411.

The question of the competency of a confession is for the trial court alone to decide. (See *Redd*, 135 Ill. 2d at 292, citing *People v. Carter* (1968), 39 Ill. 2d 31, 38.) Rulings by the trial court on the question of the voluntariness of a confession will not be disturbed by a court of review unless against the manifest weight of the evi-

dence. See *People v. Kincaid* (1981), 87 Ill. 2d 107, 120; *Prim*, 53 Ill. 2d at 70.

The record belies defendant's assertion that his confession was involuntary and that police subjected him to continuous physical and psychological abuse over a 25-hour period. Defendant's testimony reveals that he was given *Miranda* warnings at the time he was arrested. Defendant was apparently interviewed not more than five times and no one interview session appears to have lasted longer than 45 minutes. By defendant's own admission, he was alone in the interview room for possibly seven hours and may have been unhandcuffed for at least one hour. Defendant also acknowledged to Spivey that he was in good health and his body displayed no signs of abuse. Neither did defendant advise Spivey that police abused him. Further, by defendant's own testimony, when presented with the opportunity to tell Owen that he had been abused, he did not, but only told him that he did not want to give a statement and wanted to speak to an attorney. According to defendant, remarkably, this meeting with Owen occurred soon after the two sessions of police abuse. Since Owen allegedly heeded what defendant said concerning his unwillingness to give a statement, it seems inconsistent for defendant not to have also complained to Owen about the abuse.

There was also testimony that defendant was given food during the evening of April 30, and defendant, himself, acknowledged that McWeeny brought him food sometime during the next morning. Defendant also acknowledged that he was allowed to make several telephone calls. Further, Owen testified at trial that defendant indicated he had been treated fine, given food and coffee, and Troy testified similarly. Finally, there was ample consistent testimony that defendant was not abused or coerced, nor did he request an attorney or his father.

Under these circumstances, the trial court's findings were not against the manifest weight of the evidence. The trial court properly determined that defendant's confession was voluntarily made. There is no need to consider whether admission of defendant's confession was harmless, as we determine no error occurred.

We next address defendant's argument that the State failed to call all material witnesses to the circumstances surrounding his confession. Specifically, defendant claims that the State failed to call Assistant State's Attorneys Kip Owen and William Lacy, as well as the "red-haired officer." The State initially responds that defendant has waived consideration of this issue on appeal by failing to object in the trial court. See Ill. Rev. Stat. 1985, ch. 38, par. 114—11(d) (providing in pertinent part that an objection to the failure to call material witness must be made at trial).

The defense counsel who represented defendant during the suppression hearing did not object to the State's failure to call Owen, Lacy or the "red-haired officer." After a hearing on the motion was held, a second defense counsel filed a second motion to suppress or to reopen the motion, one of the bases being the State's failure to call Owen, Lacy, or another unidentified officer ("red-haired officer"). The trial court noted that no objection had been raised during the suppression hearing, found that nothing would be gained by the additional testimony of Owen, and thus declined to relitigate or reopen the motion to suppress.

Defendant raised this issue at trial in his second motion to suppress or reopen hearing on the motion. The record is incomplete, but it appears that the trial court had not yet ruled on the initial motion to suppress. As a result, the second motion presented the trial court with the opportunity to correct the alleged error and the State was also provided the opportunity to present the

allegedly material witnesses. (See *People v. Terrell* (1989), 132 Ill. 2d 178, 202.) Accordingly, we conclude that defendant sufficiently raised this issue at trial so as to preclude application of waiver in this instance. (See *People v. Harper* (1967), 36 Ill. 2d 398, 402 (recognizing error despite the absence of a timely objection in light of the "peculiar circumstances" of case which suggested constitutional infringement); see also *In re J.C.* (1979), 69 Ill. App. 3d 289 (holding objection need not occur at suppression hearing).) We turn to consider whether the State met its burden of proof by calling all material witnesses.

When the voluntary nature of a confession is challenged by a motion to suppress, the State must produce all material witnesses connected with the taking of the statements or explain their absence. (*People v. Armstrong* (1972), 51 Ill. 2d 471, 475-76; *In re Lamb* (1975), 61 Ill. 2d 383, 389.) This court has consistently enforced this rule in an unbroken line of cases. (See *People v. Rogers* (1922), 303 Ill. 578; *People v. Sweeney* (1922), 304 Ill. 502; see *Armstrong*, 51 Ill. 2d at 476 (and cases cited).) Further, the precise scope of a preliminary hearing to determine voluntariness will depend somewhat upon the circumstances of each case. (*People v. Nemke* (1962), 23 Ill. 2d 591, 600.) "[W]here the claim of coercion is based upon a single act of physical brutality allegedly committed at a particular time and place, evidence as to what took place at other times covering no claim of coercion might well be regarded as immaterial." (*Nemke*, 23 Ill. 2d at 600.) Where, however, the claim of coercion is based not upon isolated physical acts but upon the combined effect of the totality of circumstances, the scope of inquiry cannot be so restricted. *Nemke*, 23 Ill. 2d at 600.

Pienta and Marley testified that Owen and themselves interviewed defendant at 1 a.m. on May 1, 1986,

and that defendant gave a statement. Defendant's testimony makes no mention of this interview. Defendant instead testified that he met with Owen and the red-haired officer shortly after Pienta, Marley, Pederson and the other officers beat him. According to defendant, during this meeting he told Owen that he did not want to make a statement, contrary to what police had advised Owen, and he wanted to speak to an attorney. Owen did not persist in any questioning, but relayed defendant's request to the red-haired officer. Based upon this record, Owen was a material witness connected with the taking of defendant's confession. By testimony of the State's witnesses, Owen was the first State's Attorney to receive defendant's voluntary statement. By defendant's testimony, Owen was prepared to take a statement, but did not after learning defendant was unwilling and wanted to speak to an attorney.

According to the State, Lacy allegedly attended two interviews with Troy where defendant made voluntary statements. Considering defendant's testimony to the contrary that he made no statements during these interviews, that Troy wanted him to sign a written statement and choked and kicked him when he did not, Lacy was a material witness to the voluntariness of defendant's statements.

Obviously, the red-haired officer was a material witness as defendant alleged that the officer threatened him with a gun and greater abuse unless he cooperated and gave a statement. (See *People v. Wright* (1962), 24 Ill. 2d 88, 93 (holding that materiality of witnesses in coerced-confession cases is not limited to those physically present when a confession is actually made, but extends as well to those who were present when the alleged illegal conduct took place).) According to the State, a written statement of defendant was subsequently obtained.

Nonetheless, the material witness rule is not a mechanical rule but a practical one, designed to assist the court in determining whether the confession was voluntary. (*People v. Sims* (1961), 21 Ill. 2d 425, 429; see *People v. Brooks* (1987), 115 Ill. 2d 510, 518.) In the final analysis, whether a confession is voluntary or involuntary is a matter of competency of the evidence which should be left to the discretion of the trial court. (See *Sims*, 21 Ill. 2d at 434 (House, J., specially concurring, joined by Bristow and Klingbiel, JJ.).) If in order to resolve the matter, the trial court requires that all of the material witnesses be called, it should do so. Yet, if the trial court is satisfied to hear fewer than all of such witnesses, that should also be within the court's discretionary power and a reviewing court should reverse only where there has been a clear abuse of that discretion. See *Sims*, 21 Ill. 2d at 434 (House, J., specially concurring, joined by Bristow and Klingbiel, JJ.); *cf. Brooks*, 115 Ill. 2d 510 (where material witness rule restrictively interpreted as requiring the testimony of *those present during* the alleged misconduct).

The trial court was satisfied that the ruling on the motion to suppress was supported by the evidence and saw no need to call Owen, Lacy or the red-haired officer. Considering Owen's trial testimony that he was present at the 1 a.m. interview and that defendant confessed in detail (see *People v. Caballero* (1984), 102 Ill. 2d 23, 36 (holding that reviewing court may consider trial evidence in reviewing denial of motion to suppress)), Spivey's testimony that defendant said that his health was good and displayed no signs of physical abuse, as well as the several officers' testimonies, we cannot say that the trial court clearly abused its discretion in deciding the motion without these witnesses' testimony. (*Cf. In re Lamb* (1975), 61 Ill. 2d 383.) The purpose of the material witness rule is to safeguard against improperly induced con-

fessions and not to require an empty exercise. *People v. Smith* (1974), 56 Ill. 2d 328, 333.

Defendant's related contention is that the trial court failed to examine the totality of the circumstances surrounding his statements because it excluded evidence of certain writings he made during custodial interrogation. The State argues that exclusion was proper as the writings constituted hearsay.

Defense counsel sought to introduce certain photographs which allegedly depicted an interior view of the interview room where defendant was questioned. Defense counsel made an offer of proof that the photographs were intended to provide a view of the interview room where defendant was questioned and that he also intended to introduce photographs showing "certain marks" that defendant had made while in the room. The trial court ruled that the photographs of the room were inadmissible, as they lacked relevancy and were unreliable. The trial court stated it did not believe the photographs correctly and truthfully portrayed the condition of the room at the time defendant was questioned.

Carrothers was called to testify by the defense, but at the outset of his testimony, the State objected. Defense counsel made an offer of proof that Carrothers would testify that, on May 27, 1986, he went to Area Two, viewed the writings defendant allegedly made and took photographs which he was prepared to identify as well as the locations where he found the writings. The defense argued that it was not seeking to introduce the contents of statements made by the marks, but merely the mode or manner in which the material was written. The trial court ruled, however, that any statement in the form of markings was inadmissible and was not relevant. Having so ruled, the court excused Carrothers.

Photographs subsequently introduced at sentencing showed the following writings on the bench of the interview room:

"I lied about murders police threatened me with violence slapped and suffocated me with plastic—no phone—no dad signed false statement to murders (Tonto) Aaron."

"Sign false statements to murder, Tonto on statements is code word Aaron."

On the door of the room was written "Aaron lied."

Self-serving statements by an accused are inadmissible hearsay. (*People v. Tenny* (1991), 224 Ill. App. 3d 53, 62; see also *People v. Visnack* (1985), 135 Ill. App. 3d 113, 127; *People v. Barnes* (1982), 107 Ill. App. 3d 262, 267; but see *People v. Berry* (1988), 172 Ill. App. 3d 256, 262.) Such statements are considered inadmissible hearsay because their relevance depends upon the truth of the matter asserted or the declarant's belief in the truth or falsity of the matter asserted. (*People v. Young* (1990), 206 Ill. App. 3d 789, 811; see also *People v. Vanda* (1982), 111 Ill. App. 3d 551, 558 (holding testimony regarding out-of-court statements made by a defendant after commission of a crime is incompetent because the defendant had a motive to fabricate favorable testimony relating to innocence).) In this case, defendant's writings clearly constituted inadmissible hearsay.

Defendant argues, however, that the writings fall within the spontaneous declaration exception to the hearsay rule. In order for a statement to be admitted under this exception, (1) the occurrence must be sufficiently startling to produce a spontaneous and unreflecting statement, (2) there must be an absence of time to fabricate, and (3) the statement must relate to the circumstances of the occurrence. (*People v. Shum* (1987), 117 Ill. 2d 317, 343.) The record in this case demonstrates that defendant had time to fabricate. By his own

testimony, defendant was alone in the interview room at this time for about an hour, not including a brief time during which he was not questioned and drank the brown liquid. The writings are not then an exception to hearsay. *Cf. People v. Weaver* (1982), 92 Ill. 2d 545.

Defendant also argues that the writings are prior consistent statements and that they fall within an exception to the general rule that such statements are inadmissible. The State correctly argues, however, that in order for this exception to apply, the trial testimony sought to be corroborated must be charged as recently fabricated or the witness must have a motive for testifying falsely. (See *People v. Emerson* (1983), 97 Ill. 2d 487, 501.) Obviously, the motive for defendant to testify that his statements were coerced existed prior to and when he made the writings.

Defendant also asserts that the writings were also admissible under the curative admissibility or the completeness doctrines. The curative admissibility doctrine was not invoked at trial by defendant and, further, is irrelevant to the issue here. See 1 J. Wigmore, Evidence §15, at 731 (1983) (prior introduction of inadmissible evidence estops subsequent objection to other inadmissible evidence offered by opposing party); *Chicago City Ry. Co. v. Bunding* (1904), 210 Ill. 39; *People v. Higgins* (1979), 71 Ill. App. 3d 912, 931 (holding curative admissibility doctrine is not intended to operate so as to permit a party to introduce irrelevant evidence merely because his opponent brought out some evidence on the same subject, but is limited to situations where necessary to eradicate undue prejudicial inference which might otherwise ensue from the introduction of the original evidence).

The completeness doctrine permits an opposing party to introduce the remainder of an utterance or writing, so much as is required to shed light on the meaning of the evidence already received. (*Lawson v. G.D. Searle & Co.*

(1976), 64 Ill. 2d 543, 556.) The mere mention of a conversation or statement does not entitle the opponent to bring out its content. (*People v. Crawford* (1962), 23 Ill. 2d 605.) The remainder of the conversation or statement must concern " 'what was said on the same subject at the same time.' " (Emphasis omitted.) (*People v. DePoy* (1968), 40 Ill. 2d 433, 438, quoting 12 J. Wigmore, Evidence §2115 (3d ed. 1940).) Defendant's writings here were not the remainder of his statements to police. While the writings may have commented on or referred to those statements, nonetheless, they represented a separate statement, made at a different time, presumably to a different audience and concerning a different subject.

## II

### Additional Pretrial Error

Defendant maintains that additional errors occurred during *voir dire* which require that he receive a new trial. Defendant alleges the following errors: the denial of his request for individual *voir dire* and sequestration of jurors; the prohibition of counsel's participation in *voir dire*; the failure to preclude the State from death-qualifying a potential jury at the guilt phase; proceeding with a venire of 59; the exclusion of jurors voicing an opinion as to the death penalty even though they believed they could be fair in determining guilt or innocence; the failure to allow rehabilitation of Witherspooned jurors; the failure to require the State to give race-neutral reasons for exercising peremptory challenges of black jurors; and the excuse of jurors for cause prior to their placement on a panel and without allowing their rehabilitation by defendant.

Defendant merely lists these alleged errors, neither citing to authority or the record, nor presenting any argument in support of his contentions. We are mindful

that a point raised but not argued or supported by citation to relevant authority fails to satisfy the requirements of Supreme Court Rule 341(e)(7) (134 Ill. 2d 341(e)(7)) and is therefore waived. (*People v. Felella* (1989), 131 Ill. 2d 525, 540, citing *Brown v. Tenney* (1988), 125 Ill. 2d 348, 362.) Consequently, we deem the issues concerning the propriety of *voir dire* waived.

Defendant's additional contention, however, is that the State failed to comply with discovery because it failed to produce all notes taken by police officers. Defendant also contends that the State was implicated in altering those notes. Defendant contends that, as a result, his statements should have been suppressed or other sanctions should have been imposed upon the State. We note that the content of the notes would seem to concern the extent to which defendant was Mirandized.

The record shows that during the suppression hearing, Pienta testified that he gave defendant *Miranda* warnings before each session of questioning. Pienta agreed, however, that a supplemental police report, indicating that Pienta had given defendant *Miranda* warnings before defendant was taken from Area Two to the polygraph examination, did not indicate that defendant was admonished at any later time. Pienta additionally testified concerning a four-page copy of handwritten notes, taken by the officers during defendant's interrogation, on which their report was based. Pienta testified that Marley wrote the notes, Pienta did not sign the name "Pienta" which appeared on the notes, he did not know if Marley had and there were additional pages which "show[ed]" that defendant was informed of his rights during each interview. When questioned by the trial court as to whether the State had the additional pages, the prosecutor responded that he did not know because "I haven't gone through the whole general—."

Following a brief recess to clarify what notes were produced, defense counsel made an offer of proof that the State's four-page copy bore the notation, "right, Pienta," whereas defense counsel's copy did not. Defense counsel alleged that the State's copy had been altered. The trial court then indicated, for purposes of the record, that defendant had been previously represented by two other attorneys and that whatever documentary evidence defense counsel possessed had been given to him by his predecessor. The court then suggested that defense counsel request the additional pages and asked the State to make that information, including any corrections or changes, available.

Once again, defendant has waived the issue by failing to support his argument with citation to relevant authority. (See 134 Ill. 2d 341(e)(7); *Felella*, 131 Ill. 2d at 540.) Moreover, to the extent that we have considered the issue, we discern no violation sufficient to require the imposition of sanctions or the suppression of defendant's statements. The trial court reasonably concluded that the State inadvertently failed to produce the additional pages. Defense counsel did not then pursue additional discovery to obtain that information as suggested by the trial court. Additionally, the trial court appears to have rejected the notion that the slight discrepancy between the copies necessarily implicated the State in wrongdoing and that the discrepancy was particularly meaningful. We would agree.

Further, both parties agreed that defendant received *Miranda* warnings at the time of arrest and the supplemental police report indicated that fact as well. Thus, there is no controverted issue concerning whether defendant was advised of his fifth amendment rights. Whether or not police continued to warn defendant at the outset of each interview is simply beside the point. See *People v. Hill* (1968), 39 Ill. 2d 125, 131-32 (once

*Miranda*'s mandate is complied with at the threshold of questioning, it is not necessary to repeat the warnings at the beginning of each successive interview).

## III

### Miscellaneous Trial Error

Defendant argues that numerous errors occurred at trial. Defendant initially contends that evidence of his gang membership and local gang affiliations was irrelevant, highly inflammatory and prejudicial. The State responds that the probative value of this evidence tended to establish motive and outweighed its possible prejudicial effect and, thus, the trier of fact was entitled to receive such information. We agree.

During opening argument, the State told the jury that they would hear evidence that defendant was nicknamed "Lone Ranger" and was a "leader of the Apache Ranger street gang." The State described defendant and fellow gang members as being on a "mission" when they went to the Sanchez home. No objection was raised. During presentation of the evidence, the State elicited testimony of defendant's gang membership and leadership from various witnesses. Marva Hall testified that she knew defendant by the name of "Lone Ranger" and knew him to be a leader in the Apache Rangers gang. Sharon Haynes also testified that defendant was known as "Ranger" and belonged to a gang. Carlton Ford testified that defendant was nicknamed "Ranger" and that he and defendant had been members of the same gang. Ford also testified that he knew "Rambo" and he would see defendant at Rambo's house. The State then introduced photographs of Rambo's house, depicting walls covered with gang graffiti, which Ford identified.

Lastly, Officer Jackson, the officer who located defendant hiding in the attic, testified that he investi-

gates gang problems and attempts to familiarize himself with gang members in the district. Jackson testified that he knew defendant as a member of a street gang. Jackson also explained the procedure undertaken by the police department in its attempts to garner information about street gang membership. Jackson further testified as to the affiliations of the local gangs, including the Apache Rangers, and that he had previously witnessed Caine in defendant's company. He explained that on April 30, he was looking for defendant at several locations based on information from "street sources" and police records.

This court recognizes that, particularly in metropolitan areas, there may be a strong prejudice against street gangs. (*People v. Smith* (1990), 141 Ill. 2d 40, 58.) It has been consistently held, however, that where evidence is relevant and otherwise admissible, it is not to be excluded because it may also have a tendency to prejudice the accused. (See *People v. Hairston* (1970), 46 Ill. 2d 348, 372 (and cases cited).) Evidence of gang affiliation need not be excluded if it is otherwise relevant and admissible. (*Smith*, 141 Ill. 2d at 58 (and cases cited).) Evidence indicating the defendant was a gang member or involved in gang-related activity is generally held to be admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act. (*Smith*, 141 Ill. 2d at 58, citing *Hairston*, 46 Ill. 2d at 372.) Such evidence, however, is only admissible where there is sufficient proof that membership or activity is related to the crime charged. (*Smith*, 141 Ill. 2d at 58, citing *Hairston*, 46 Ill. 2d at 372.) The determination of whether such evidence is admissible is primarily an inquiry into its relevance to the charges. *People v. Buchanan* (1991), 211 Ill. App. 3d 305, 320 (citing *Hairston*, 46 Ill. 2d at 372, and *People v. Calderon* (1981), 98 Ill. App. 3d 657, 661).

In the present case, defendant introduced the element of gang membership and affiliations by admitting to police that he was known as "Ranger," who is "all you need *** when you go on a job," and that he and Caine went to the Sanchez residence because Caine was having gang problems in his "hood" and needed guns. Defendant's admission to police that he, "Rambo," Caine and "Arbuckle" went on a "mission" when they went to the Sanchez home was additional evidence of that element. Further, defendant admitted that the motive for the Sanchez murders was to obtain guns for Caine's gang problems. Testimony by Hall, Haynes, and Ford that defendant was a gang member or leader merely corroborated defendant's admission of gang affiliation. Photographic evidence of Rambo's gang affiliation served to further corroborate defendant's admission that he, as the "Ranger," and Rambo, among others, had gone on a "mission," or a "job." Jackson's testimony concerning police information-gathering laid the basis for his personal knowledge of local gang affiliations and defendant's gang membership. His personal knowledge of gang allegiances and his witnessing of Caine's association with defendant served to confirm defendant's expressed motivation behind the otherwise inexplicable murders. Thus, in our view, such testimony was properly admitted and served to establish the underlying motive for these killings. *Cf. People v. Rivera* (1986), 145 Ill. App. 3d 609.

Defendant, however, relies upon *Smith*, where this court recognized that "through the guise of motive evidence, the State may present to the jury highly inflammatory matter which, in actuality, is of little or no probative value." (*Smith*, 141 Ill. 2d at 57.) In *Smith*, the State undertook to demonstrate that the defendant was a gang member who killed an assistant warden on behalf of another gang member in retaliation for the warden's intolerance of gang-related activity in the penitentiary

system. In support of this theory, the State introduced evidence that there was a variety of gang-related activity in the system, that the person alleged to be a gang leader, who was influential in the neighborhood, had an altercation with the warden while imprisoned, and that the defendant associated with that person. As such, this court found that the State had only asserted evidence of motive in the abstract and that evidence of gang-related activity offered to support the so-called "motive" was of little probative value. The present case contrasts markedly with *Smith*, as the motivation here, the theft of guns for gang-related activity, was not merely theoretical, but was admitted by defendant. Hence, *Smith* is readily distinguishable. Evidence of gang membership and relationships in support of that motivation is therefore probative of the issue.

We turn to defendant's next contention that internal police documents showing prior misconduct by the interrogating officers was relevant and should have been admitted. Defendant argues as a related matter that the State should have been sanctioned for interfering with and delaying the production of this evidence.

Subsequent to the suppression hearing, yet prior to trial, defense counsel sought to subpoena from the Chicago police department's office of professional standards any complaints filed against the detectives who had questioned defendant. Defense counsel also alleged that Sue Kelly, an attorney with the Chicago police department's legal affairs, was told by the State not to allow defense counsel access to the records in accordance with a court order.

The State moved to quash the subpoena on the basis that it was overly broad, the information sought was irrelevant to the current proceedings and was also inadmissible at trial. The State also denied the allegation concerning its communications with Kelly, stating that it

had simply advised Kelly that the trial court had denied the motion to suppress. Both parties then agreed that one alleged incident involving the detectives had been identified in files. The trial court, finding that the subpoena was "very broad," determined to conduct an *in camera* inspection of the file to determine its relevancy.

Following the *in camera* inspection, the trial court named the complainant who was arrested at Area Two, stating that the alleged incident occurred in 1985 and involved Pienta, Marley and Pederson. The trial court stated that the allegations, which resulted in an unfounded claim of a police beating, were "irrelevant and immaterial." The court further explained that "[i]t's not relevant because there's absolutely no connection with what you're attempting to allege and what was alleged here." The trial court thus granted the motion to quash the subpoena and impounded the records.

The essence of defendant's argument is that prior unfounded accusations against Pienta, Marley and Pederson of a police beating tend to make it more probable that his confession was coerced by these same officers. Evidence is relevant if it has any tendency to make the existence of any fact of consequence to the case more probable than it would be without the evidence. (See *People v. Johnson* (1986), 114 Ill. 2d 170, 193; *People v. Monroe* (1977), 66 Ill. 2d 317, 321-22.) We do not believe, however, that the trial court here abused its discretion in determining that such evidence does not accomplish that result. The admissibility of evidence is within the sound discretion of the trial court and a reviewing court will not substitute its judgment on admissibility absent a clear showing of abuse. (See *People v. Gorney* (1985), 107 Ill. 2d 53, 59.) A mere unfounded accusation that these officers beat someone who was arrested at Area Two one year previously, without more, does not tend to make it more probable that they coerced defendant's

confession. The trial court stated that there was absolutely no connection between the prior allegations and defendant's claims. Indeed, defendant in his brief appears to concede that a similarity in the allegations is the necessary element underpinning the claim of relevancy here. In this regard, we cannot second-guess the trial court's determination. We do not have the benefit of its *in camera* review. Certainly, the trial court may exclude evidence when its relevancy is so speculative that it is of little probative value. (*People v. Gorney* (1985), 107 Ill. 2d 53, 60.) Accordingly, we find no abuse of discretion. Neither do we find that sanctions against the State were in order based merely upon defense counsel's allegations of prosecutorial interference.

Defendant next contends that the trial court prevented him from developing several theories of defense by excluding certain testimony. Specifically, defendant asserts that he was precluded from developing theories that Vincent Sanchez was a "fence" killed by an unhappy client and that Marva Hall was lying.

During opening remarks, the State referred to the victims' lives as "quiet and simple." During the later cross-examination of Officer McGuire, defense counsel attempted to elicit testimony that one of the guns found by police in the Sanchez residence was stolen. The trial court sustained the State's objection to this line of questioning on the basis that the character of the victims had not been placed at issue and, even if it had been, such evidence was inadmissible, absent a showing of self-defense.

With regard to the second alleged theory, during direct examination of Carlton Ford, defense counsel attempted to establish that Ford had received only collect telephone calls from defendant while he was in jail. The trial court, however, sustained objections to this line of questioning. Defendant claims that, if allowed, this line

of examination would have implied that Hall was lying when she testified that defendant telephoned from jail and threatened her.

Further, under cross-examination by defense counsel, Isaac Carrothers testified that Hall had told him that "she was scared of the police." The trial court sustained the State's objection to this testimony, considering the comment to be volunteered, and ordered that it be stricken. When defense counsel attempted to pursue the subject, the trial court again sustained the State's objection. Defendant asserts that such record also demonstrates that he was precluded from developing the theory that Hall was lying.

The admissibility of evidence is within the sound discretion of the trial court, and a reviewing court will not substitute its judgment on admissibility absent a clear showing of abuse. (See *People v. Gorney* (1985), 107 Ill. 2d 53, 59.) Further, the scope of cross-examination rests within the discretion of the trial court and its ruling will not be disturbed on review unless there has been an abuse of discretion resulting in manifest prejudice to the accused. *Gorney*, 107 Ill. 2d at 59.

An accused may attempt to prove that someone else committed the crime with which he is charged, but this right is not without limitations. (*People v. Ward* (1984), 101 Ill. 2d 443, 455; *People v. Ennis* (1990), 139 Ill. 2d 264, 281; see also 22A C.J.S. *Criminal Law* §729 (1989) (such evidence admissible if a proper foundation is laid, unless its probative value is substantially outweighed by actual risk of undue delay, prejudice or confusion).) Such evidence may be rejected on grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty or its possibly unfair prejudicial nature. See *Ward*, 101 Ill. 2d 443 (testimony that victim's minor brother had also been previously beaten and taken to hospital

and testimony whether codefendant had been observed previously beating her children held properly excludable).

In this case, defendant attempted to establish that one of the guns found in the Sanchez residence was stolen and thereby show that Vincent Sanchez was a fence, possibly killed as the result of a stolen goods transaction. This court has recognized, however, the principle that specific prior acts are not admissible to show another person's character as evidence of his conduct on a particular occasion. (See *People v. Willy* (1921), 301 Ill. 307, 318; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §404.4, at 186 (5th ed. 1990) (generally, evidence of specific acts is not admissible for the purpose of showing character; proof must be by reputation); IA J. Wigmore, Evidence §63.1, at 1382 (Tillers rev. ed. 1983); see *People v. Redmond* (1972), 50 Ill. 2d 313; *People v. Greely* (1958), 14 Ill. 2d 428.) The reasons for such a rule are fairly obvious. It would be unfair to allow a single prior act of the decedent to show his character to behave or react in a certain way; such an allowance would open up collateral issues; and the State could not be expected to anticipate and rebut all such evidence. (See S. Gard, Jones on Evidence §4:44, at 472-73 (6th ed. 1972).) Consequently, in view of such rule, we do not believe the trial court abused its discretion by rejecting testimony that a gun found in the Sanchez home was stolen. Such evidence possessed little probative value in view of its uncertainty and possible prejudicial effect. Moreover, we note that admissible evidence was introduced which showed that the Sanchez residence was barricaded and contained an inordinate amount of used items. Defendant was not thereby unfairly disadvantaged by the trial court's ruling.

Defendant additionally asserts that the State's opening remark about the victims' lives was prejudicial error because it was an unfair characterization "contrary to

the logic" of *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529. *Booth*, however, has been recently overruled by *Payne v. Tennessee* (1991), 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597, which holds that victim impact evidence is admissible during sentencing. Moreover, the prohibition against commentary regarding victims' lives recognized in *Booth* concerns such commentary during sentencing and not during the guilt phase. Consequently, whatever may have been the "logic" of *Booth*, such "logic" is not relevant to the facts before us.

Defendant also contends that the State impermissibly commented on his post-arrest silence in violation of his due process rights as recognized in *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240. Defendant points to the following colloquy which occurred at trial during examination of Officer Jackson:

"[Prosecutor]: Did he answer that question?

[Witness]: Yes, he did. You may waive the right to advice of counsel and your right to remain silent, and you may answer questions or make a statement without consulting a lawyer if you so desire.

[Prosecutor]: Did he answer that?

[Witness]: Yes, he did. Do you understand each of these rights.

[Prosecutor]: What was his reply to that?

[Witness]: Yeah. Do you wish to answer questions, at this time?

[Prosecutor]: What was his reply?

[Witness]: No.

[Defense Counsel]: Objection, Judge. I move for a mistrial, at this time."

During the ensuing sidebar, the State claimed that it had expected the witness to testify that defendant had indicated that he would be willing to converse later. The trial court thus allowed the examination to continue, reserving ruling on the defense's objection:

"[Prosecutor]: Now, Officer, you didn't ask Aaron Patterson any questions with regard to the homicide of the Sanchezes, did you?

[Witness]: No.

[Prosecutor]: And maybe if I misunderstood you, when you asked him if he would be willing to talk to you at some later time, did he say, yes?

[Witness]: No, not to me, no.

[Prosecutor]: He didn't refuse to answer questions?

[Witness]: He didn't say anything after I read him the rights. After he said, no, he said nothing.

[Defense Counsel]: I renew my objection."

The trial court called for a conference in chambers asking the State to explain its questioning, which appeared to the court to be a *Doyle* violation. The State responded that it was only attempting to show that the witness and defendant did not discuss the case, and that the witness only transported defendant. The State asserted that it was surprised by the witness' answers. The trial court found the error harmless and curable by jury instruction. The trial court denied the motion for mistrial. The trial court then immediately instructed the jury to disregard the objectionable examination. No further mention of defendant's post-arrest silence occurred.

In *Doyle*, the Supreme Court held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." *Doyle*, 426 U.S. at 619, 49 L. Ed. 2d at 98, 96 S. Ct. at 2245.

This court has determined that a *Doyle* violation may constitute harmless error in certain circumstances. In *People v. Miller* (1983), 96 Ill. 2d 385, *aff'd* (1987), 483 U.S. 756, 97 L. Ed. 2d 618, 107 S. Ct. 3102, the prosecutor asked the defendant why he had not related his exculpatory story following his arrest. The trial court sustained an immediate objection to the question and

advised the jury to "ignore" such questions "for the time being." No further reference to or argument of defendant's post-arrest silence occurred. Under these circumstances, and in light of the fact that the properly admitted evidence was sufficient to prove the defendant's guilt beyond a reasonable doubt, the questioning was found to be harmless error.

In *People v. Lucas* (1989), 132 Ill. 2d 399, a witness volunteered that the defendant had asked for an attorney, and the trial court immediately sustained an objection and instructed the witness to make no further references to the subject. The remark was not stricken and no curative instruction was given because defense counsel indicated that he did not wish to draw attention to the statement. No further reference to or argument of the statement was made. Under the circumstances and in view of the overwhelming evidence of guilt, the statement was found to be harmless.

We do not consider the present case to be analogous to *People v. Pegram* (1988), 124 Ill. 2d 166, where the error was not found to be harmless. *Pegram* concerned an improper inquiry which resulted in the defendant's agreeing that he had remained silent under questioning and that his trial testimony was the first time he had told his version of the crime. The prosecutor relied on this evidence as well during closing argument.

Thus, relying on *Miller* and *Lucas*, we do not find that the circumstances here mandate reversal. The brief commentary on defendant's post-arrest silence here during the lengthy trial was less egregious than the single remark in *Miller*. The curative instruction here was also clearer than that in *Miller*. Further, as in *Miller* and *Lucas*, but in contrast to *Pegram*, the State did not later rely on the fact of defendant's post-arrest silence as evidence to support its case. The admissible evidence is also sufficient to prove defendant's guilt beyond a reasonable

doubt. This is not a case where, absent the impermissible inquiry, the jury might well have returned a different verdict. (See *Miller*, 96 Ill. 2d at 396.) We find the error harmless beyond a reasonable doubt. *People v. Beller* (1979), 74 Ill. 2d 514, 525.

Defendant next argues that the law-of-the-case doctrine required declaration of a mistrial. During the suppression hearing, Judge Cieslik ruled that he would declare a mistrial if there was any allusion to or questioning concerning polygraph examination. At trial, during cross-examination of Pienta, defense counsel unintentionally elicited the response that "[a]t 8 o'clock Mr. Patterson was downtown at the polygraph." Defense counsel continued the examination until Judge Morrissey called for a sidebar. Considering any error to have been harmless, Judge Morrissey denied defendant's motion for a mistrial. Judge Morrissey then admonished Pienta not to again make mention of any polygraph. The jury was not instructed because defense counsel indicated that he wanted the subject to be minimized.

Under the law-of-the-case doctrine, generally, a rule established as controlling in a particular case will continue to be the law of the case, as long as the facts remain the same. (14 Ill. L. & Prac. *Law of the Case* §74, at 233 (1968); see *PSL Realty Co. v. Granite Investment Co.* (1981), 86 Ill. 2d 291, 312; *Bradley v. Howard Hembrough Volkswagen, Inc.* (1980), 89 Ill. App. 3d 121, 124 (holding court is bound by views of law in its previous opinion in a case, unless the facts presented require a different interpretation); see also *Christianson v. Colt Industries Operating Corp.* (1988), 486 U.S. 800, 815-17, 100 L. Ed. 2d 811, 829-31, 108 S. Ct. 2166, 2177-78 ("the doctrine applies as much to the decisions of a coordinate court in the same case as to the court's own decisions").) The doctrine, however, merely expresses the practice of courts generally to refuse to reopen what has

been decided; it is not a limit on their power. (14 Ill. L. & Prac. *Law of the Case* §74, at 234 (1968); *Christianson v. Colt Industries Operating Corp.* (1988), 486 U.S. 800, 817, 100 L. Ed. 2d 811, 831, 108 S. Ct. 2166, 2178.) Further, and more important, a finding of a final judgment is required to sustain application of the doctrine. See *Hunter v. Atchison, T. & S.F. Ry. Co.* (7th Cir. 1951), 188 F.2d 294, 299.

Here, the facts before the trial court concerning the mention of polygraph examination by witnesses did not remain the same. The circumstances surrounding Pienta's mention of the polygraph were recent developments, unknown to Judge Cieslik at the time he ruled that any mention of polygraph would result in mistrial. Certainly, Judge Cieslik's ruling was not a final judgment. Consequently, Judge Morrissey could revisit the polygraph evidence issue, interpreting the surrounding facts differently, and was not required to declare a mistrial. We find no error in this regard.

Defendant's final contention regarding trial is that the State improperly commented during closing argument on his exercise of the fifth amendment privilege not to testify.

Defendant directs our attention to the following colloquy which occurred during the State's closing argument to the jury:

> "[State]: Now, ladies and gentlemen, once again counsel gets into this[,] use your imagination, speculation once again. Something happened. Well, he tells you in his opening statement about this stuff about suffocation and beating. You didn't hear any of that.
> [Defense Counsel]: Objection, judge.
> [State]: Because it didn't happen.
> [Defense Counsel]: Objection.
> [Court]: Counsel may argue, Mr. Dosch.
> [Defense Counsel]: I move for a mistrial at this time.
> [Court]: Denied. Counsel may argue."

Defendant maintains that these remarks suggested to the jury that its attention ought to be focused on the defendant's failure to take the stand. See *People v. Thomas* (1980), 89 Ill. App. 3d 592, 603.

Defendant claims that the following comments by the State during its opening argument further support his position:

> "You'll hear from the executioner's mouth, by his statements, statements which he made to the police after he was arrested ***. *** He'll tell you how he and the defendant Caine, a member of an allied gang, went to get some guns, how they went into the Sanchez residence and when he refused to cooperate and help them find anything of value that Aaron Patterson went off and as he described it, he stabbed Mr. Sanchez, ninja style. He'll describe from his own mouth how Rafaela Sanchez watched this and as she watched this, she screamed and tried to run for her life, but he stabbed her, too, executing her."

The test for determining whether a defendant's right to remain silent has been violated is whether the reference was intended or calculated to direct the attention of the jury to the defendant's failure to testify. *People v. Franklin* (1990), 135 Ill. 2d 78, 101; *People v. Dixon* (1982), 91 Ill. 2d 346, 350.

According to the State, its initial comment was responsive to defense counsel's comment in opening argument that the "evidence is going to show that they beat him up and tried to suffocate him with a plastic bag to get him to confess." Also, according to the State, it was properly commenting on the defense's failure to produce whatever evidence was promised by the defense's opening argument. See *People v. Huddleston* (1988), 176 Ill. App. 3d 18, 30.

In our view, the initial comment concerned the failure of the defendant's evidence in general to support the

opening claims. No evidence in general was introduced that defendant was beaten and nearly suffocated. Further, defendant cannot be heard now to complain. Defendant opened the door to this exchange by asserting that the evidence would show these facts. The evidence, eventually, did not. The State merely commented upon that fact. That the State commented such evidence was not heard does not necessarily mean that the jury did not hear from the defendant.

The second comment of which defendant complains expressly anticipated the introduction of defendant's statements to police and merely attempted to attribute those statements more closely to him, rather than police. Accordingly, we find no impermissible motivation to focus on the defendant's failure to testify.

IV

Cumulative Effect of Trial Error

Defendant asserts that additional errors, in combination with the other claimed errors, mandate reversal. Defendant asserts that: the State referred to a courtroom observer as "Skiman," a gang member; the trial court erred by denying a motion for directed verdict; the verdict was based on evidentiary facts which did not exclude every reasonable hypothesis of innocence; the trial court should have allowed examination of Pienta about his involvement in custodial interrogation of Andrew Wilson (see *People v. Wilson* (1987), 116 Ill. 2d 29); the trial court erred by not allowing the medical examiner to respond that he did not recall what he told defense counsel about the bodies' decomposition; prejudicial error resulted from publication of photographs of the victims before the defense cross-examined as to the State's exhibits; a statement of defendant, undisclosed in discovery, was elicited by the State; and exclusion of testimony

concerning Gas Company records was in error as defendant was prevented from developing a defense.

A point raised but not argued or supported by citation to relevant authority fails to satisfy the requirements of Supreme Court Rule 341(e)(7) and is therefore waived. (*Felella*, 131 Ill. 2d at 540; *Brown v. Tenney* (1988), 125 Ill. 2d 348.) Accordingly, we deem these matters waived, as defendant cites to neither authority, nor in some instances, relevant portions of the record.

As previously discussed, we find no substantial trial error and are unwilling to reverse even though the evidence against defendant is circumstantial. See *People v. Williams* (1968), 40 Ill. 2d 522 (holding reversal unwarranted in circumstantial evidence case absent substantial trial error).

## V

### Double Jury Procedure

Defendant argues that he was prejudiced by the double jury procedure. Defendant was tried with Caine using a double jury procedure, commencing on September 12, 1989, and concluding on October 2, 1989. The two juries were brought into and taken out of the courtroom as the evidence pertinent to each case was presented. Defendant claims that he was prejudiced because of the length of the trial, and the fact that his jury consistently sat on harder seats than did the Caine jury. We find these arguments meritless. There is no reason to believe that defendant would not have been convicted save for the length of his trial and the jurors' physical discomfort.

Defendant also claims that the double jury risks making the jury conviction prone. He claims that by utilizing such a procedure with two defendants present, the jurors may assume that the State has not erred in its

charges; and further that what they are not allowed to hear is about "their" defendant. We, again, reject defendant's argument. Defendant presents no authority and we find nothing in this record to support this argument.

## VI

### Miscellaneous Sentencing Errors

We next address defendant's various claims of sentencing error. First, defendant claims that the trial judge erred, during the eligibility phase of the sentencing hearing, by instructing the jury after it had reached a verdict. Defendant does not, however, contend that the jury changed its verdict as a result of the instruction. Rather, defendant contends that because there was confusion as to whether the jury had in fact reached a verdict, the trial court should have made inquiry to clarify the matter. Defendant cites no authority to support his argument.

The record concerning this issue was established after the fact. The record reveals that the trial judge, while presiding over the eligibility hearing of codefendant Caine, received a note from defendant's jury. The note requested clarification of the word "intent." Also attached to the note was one of the four possible verdict forms which had been submitted to the jury. The trial judge then wrote his explanation on the form and sent the note back to the jury over defense counsel's objection that the jury had already reached its verdict. In the later discussion of this series of events, the judge expressed his view that the jury had not reached a verdict at the time the note was received. The judge acknowledged, however, that court personnel, possibly a deputy sheriff, had referred, at the time, to the jury's reaching a verdict, but nonetheless wanting an explanation. The

State noted for the record that the Caine jury had reached its verdict at the time the note was brought to the judge. Defense counsel continued to assert, however, that the note had been returned to the jury after it had reached its verdict.

We believe this record does not establish that the jury had reached a verdict at the time the judge sent his explanation to the jury. Further, even if a verdict had been reached, the trial court's action could not be considered to be anything more than harmless error since the issue of defendant's eligibility for the death penalty would have already been resolved. Accordingly, we find no merit to defendant's argument.

Next, defendant contends that evidence related to his gang affiliation was irrelevant and therefore inadmissible in aggravation. During the second phase of the sentencing hearing, Detective McWeeny testified that he investigated the beating of Russell Warner, who had accused defendant and his fellow gang members of the offense. McWeeny testified that he went to the site where Warner was found and followed a trail of blood to the door of a nearby residence. McWeeny heard noises and entered. McWeeny testified that the basement area of the residence appeared to be "like a club house for gang members" with gang graffiti and symbols on the walls. McWeeny identified photos depicting the walls. According to McWeeny, there appeared to be blood on the floor and a baseball bat or "something to that effect." McWeeny later learned that the residence was the home of Elias Roland, also known as "Rambo." No objection was raised to this testimony.

Henry Simmons testified that he had prosecuted defendant in October 1986 for murder. Simmons testified that after being found guilty, defendant had told the judge that he was a leader of the Apache Rangers, that

his gang fights other gangs, and that he would continue to do so no matter what happens to him.

Three Cook County jail officers testified that defendant had "shanked" another inmate while awaiting trial. In testifying to circumstances surrounding the incident, one of the officers referred to a letter found in defendant's cell. The letter was read to the jury by the officer. When questioned, the officer testified that a name, "Imam Malik," appearing in the letter, was a reference to Jeff Fort, the alleged leader of the El Rukin street gang. The officer also testified that he believed the inmate whom defendant "shanked" had been convicted of the murder or attempted murder of Fort's brother.

Officer Jackson testified that defendant had telephoned him from jail, identifying himself as "Ranger Aaron Patterson, leader of the Apaches." Defendant described certain incidents which were known only to defendant, Jackson and other officers. Defendant asked Jackson why Steve Weathersby, known to Jackson as defendant's fellow gang member, was arrested and what charges had been filed against him. Jackson would not give defendant an answer, so defendant hung up. When defense counsel objected to this testimony, the State explained that the testimony implied that defendant was directing and carrying on gang activities from jail. The prosecutor stated that while "[a] leader *** checking on how fellow gang members are doing is not relevant," his calling from jail shows "that he is still controlling that gang and involved in that gang from the jail."

This court has held that when determining the admissibility of evidence during this phase of a sentencing hearing, the only requirement is that the evidence be relevant and reliable (*People v. Free* (1983), 94 Ill. 2d 378, 422; *People v. La Pointe* (1981), 88 Ill. 2d 482, 498), and the determination of such lies within the sound discretion of the trial judge (*People v. Brisbon* (1989), 129 Ill.

2d 200, 223). "Evidentiary rules are waived at this stage because it is important that the sentencing authority possess the fullest information possible with respect to the defendant's life, character, criminal record and the circumstances of the particular offense." (*Brisbon*, 129 Ill. 2d at 218-19.) Any evidence regarding a defendant's character is relevant. (*People v. Stewart* (1984), 104 Ill. 2d 463, 492; *People v. Salazar* (1988), 126 Ill. 2d 424, 468.) Additionally, evidence regarding a defendant's gang affiliation may be relevant to his character. See *People v. Salazar* (1988), 126 Ill. 2d 424.

Initially, we note that defendant did not object at trial to Detective McWeeny's testimony and review of its propriety is therefore waived. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186-88.) We thus address defendant's additional claims regarding gang-affiliation evidence.

Certainly, Simmons' testimony that defendant had proclaimed himself a gang leader who intended to continue fighting, regardless of consequences, was relevant to defendant's rehabilitative potential. Similarly, we believe that the jail officer's testimony concerning gang-related references in the letter as well as his identification of the "shanking" victim were relevant to defendant's motive for the attacks, which in this case surely reflects on character. Further, we cannot say that the testimony was unreliable as it was based on the witness' 4½ years of experience with the Department of Corrections and his formal training to recognize standard abbreviations and language common to street gangs. The officer's testimony was further corroborated by the overwhelming admissible evidence of defendant's gang affiliation. See *Salazar*, 126 Ill. 2d at 468.

We believe also that Jackson's testimony that defendant telephoned him inquiring about a fellow gang member and the charges against him raises the legitimate inference that defendant telephonically involved himself in

outside gang activities while confined to jail. Such continuing involvement certainly reflects on defendant's character. In sum, we cannot say that the trial court abused its discretion by admitting this gang-related evidence at sentencing.

Defendant's second contention is that improper remarks by the State and improper rulings and instructions by the trial court placed the burden of proving mitigation on the defense. Defendant's contention is multifaceted; he alleges numerous errors which supposedly support this contention. Yet again, defendant fails to support a majority of the allegations with argument and citation to relevant authority. (See *Felella*, 131 Ill. 2d at 540.) Defendant alleges the following errors, without supporting citation or significant argument: defense counsel's cross-examination of corrections officer Junius Jones as to defendant's involvement in a particular jailhouse altercation was unduly limited; Carrothers' testimony concerning photographs of defendant's writings was disallowed; the jury was reinstructed on felony murder during the eligibility phase; defendant's father was precluded from testifying regarding defendant's signature; objection to defense counsel's argument that defendant dropped a gun as opposed to shot the gun at an officer was improperly sustained; a sentencing consultant's report was improperly denied admission and his examination was unduly limited; defense instructions were improperly rejected; a pattern jury instruction which was given violated the eighth amendment; an instruction to the jury not to consider sympathy in mitigation was improper; and the denial of defense counsel's request to be heard first in close and allowed rebuttal was in error. We deem these matters waived. *Felella*, 131 Ill. 2d at 540.

The remaining alleged errors, supported by authority, are as follows. First, defendant asserts that he bore the

burden of proving mitigation because his direct examination of his parents was limited.

Initially, we note that the burden of proof at sentencing is borne by the State as well as defendant. At the eligibility phase, the State bears the burden of proving the existence of statutory aggravating factors which qualify the defendant for the death penalty. The defendant, in turn, has the burden of coming forward with evidence of mitigation sufficient to preclude imposition of the death penalty. *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 445-46.

Raymond and Joanne Patterson, defendant's parents, testified about defendant's childhood, upbringing and family background. The trial court sustained objections to the Pattersons' testimony concerning how they felt and reacted to defendant's being found guilty. The trial court ruled such testimony was irrelevant, calling for an opinion or conclusion. We agree. Such evidence was patently intended only to evoke sympathy from the jury and is irrelevant to an aggravation and mitigation inquiry. (See *People v. Olinger* (1986), 112 Ill. 2d 324, 351 (sympathy is not a proper factor for consideration in a death penalty hearing).) Accordingly, no undue burden was placed upon defendant's ability to show mitigation by exclusion of this testimony. The trial court did not abuse its discretion by disallowing such testimony.

Defendant additionally contends he bore the burden of mitigation because exhibits concerning his childhood were not sent to the jury during its deliberations. The record shows that defendant's mother identified various photographs of defendant which depicted him at school and on family vacations. Defense counsel requested that the defense exhibits be sent to the jury room. The trial court allowed defendant's prom photo and a photo of him as an altar boy to be sent, but disallowed more youthful childhood photos of defendant as well as a

Mother's Day card he made when he was six or seven years old. Regarding these photos, the trial court stated:

"I think the altar boy picture and the prom picture are sufficient. I think that they have more sympathy value than anything else. I agree with [prosecutors] to that extent, but I will again, since the prosecution is seeking to take Mr. Patterson's life, I will allow the jury to consider that on the issue of relevance as to his background, his character, when he was in high school and grade school."

Clearly, the trial court considered what photographs were relevant to defendant's character and background. A Mother's Day card, made when defendant was a young child, is not relevant to the sort of man he has become and such evidence would only have incited sympathy in the minds of the jurors. Childhood photographs can only be considered similarly irrelevant and would have had a similar prohibitory effect. Defendant was not unduly burdened in his presentation of mitigation evidence by this ruling.

Finally, with respect to the burden of mitigation, defendant complains that the trial court disallowed defendant's academic records to be sent to the jury. David Randall, a sentencing consultant retained by the defense, testified concerning his investigation of defendant's personal and family backgrounds as well as educational, army and work experiences. Randall identified defendant's high school transcript and various academic awards and honors defendant had received which were offered as exhibits. The defense sought to have defendant's academic records sent to the jury during its deliberations.

The trial court stated:

"I think Mr. Randall sufficiently described his academic material. He testified he graduated in the upper third of his class, 2.73 academic average, I believe ***. *** Especially since there has been testimony about his

high school life and grades, the fact he was on the honor roll for one year at De LaSalle, I think that's sufficient. The jury does not have to look at his academic records. It does not further anything."

Considering that there was extensive testimony by Randall regarding defendant's scholastic achievements, we agree with the trial court that the records themselves would not have assisted defendant any further. Accordingly, defendant was not unduly burdened in presenting mitigation.

Defendant's last contention regarding sentencing is that the State made a variety of improper remarks during closing argument. Defendant first claims that the prosecutor improperly commented on his gang affiliation by the following remark:

"Is the death and punishment and the letter found in defendant's personal belongings, is that a true indication of what the defendant Aaron Patterson, is about? Of course it is. Is his statement to Judge Moran after being found guilty of his intent to continue the gang violence that he proliferates *** proof of what defendant, Aaron Patterson, is?"

Statements based upon facts in evidence, or upon reasonable inferences drawn therefrom, are within the scope of proper argument. (See *People v. Fields* (1990), 135 Ill. 2d 18, 64 (holding references to defendants' gang membership were proper commentary upon the evidence).) Thus, we believe this comment was proper, as it was based on admissible evidence relevant to defendant's character.

Defendant also complains that the prosecutor commented several times that defense counsel misstated the evidence. We have reviewed the comments and conclude that they were not improper given their plain meaning as well as their context. (See *People v. Weathers* (1975), 62 Ill. 2d 114, 120 ("[e]ach case of this kind must be de-

cided upon its own facts").) It can fairly be said that one party's statement of the evidence is always a misstatement of the evidence as far as the opposing party is concerned. Here, each comment occurred as the prosecutor argued that there existed inconsistency between the defendant's characterization of the evidence and the evidence itself. Thus, the comments do not amount to more than a fair commentary on the evidence. Certainly, these comments do not rise to the level previously considered to be error by this court. (See *People v. Emerson* (1983), 97 Ill. 2d 487, 497 (prosecutor stated that defense counsel had laid down a smokescreen composed of lies, misrepresentations and innuendoes and that all defense attorneys try to "dirty up the victim"); *Weathers*, 62 Ill. 2d 114 (prosecutor charged defense counsel with lying and attempting to create reasonable doubt by confusion, indecision and misrepresentation); *cf. People v. Harris* (1989), 129 Ill. 2d 123, 160-61 (finding that prosecutor's comment to jury, "[d]on't be confused as the defense wishes you to be," was "relatively innocuous").) Further, even if we consider these comments improper, they do not constitute reversible error, as we cannot say that defendant was substantially prejudiced. See *People v. Baptist* (1979), 76 Ill. 2d 19, 29.

Defendant also complains that the prosecutor improperly speculated that he would commit other bad acts even if he was sentenced to life. The record shows that the prosecutor told the jurors that one of the decisions they would make was whether defendant should receive a life sentence. The prosecutor then asked the jury to think about the "likelihood" of other inmate, jail guard, and fellow gang member victims when weighing the "likelihood" that defendant's conduct would continue against the "likelihood" of his rehabilitation.

This court has held that speculating on the possibility that the defendant might commit future crimes if he is

not executed may cause the jury to focus upon a speculative possibility that may or may not occur and that is immaterial to the jury's consideration of aggravating and mitigating factors. (*People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 401, citing *People v. Hooper* (1989), 133 Ill. 2d 469, 500; *People v. Gacho* (1988), 122 Ill. 2d 221; *People v. Walker* (1982), 91 Ill. 2d 502, 515.) Such commentary may not, however, be considered reversible error, in light of the whole record and the evidence of the defendant's conduct while in custody. (See *Pitsonbarger*, 142 Ill. 2d 353, 403 (finding that prosecutor's commentary which implied defendant might kill guards and inmates was not "naked" speculation and immaterial to the consideration of sentencing factors where defendant made such threats).) Certainly, in this case, there was an evidentiary basis for the comments. Defendant had, in fact, viciously attacked an inmate and a guard while he was confined. Thus, we cannot conclude that the comments were of such substantial error as to deny defendant a fair trial.

Lastly, defendant claims that the prosecutor inflamed the jury by analogizing him to "Satan." The prosecutor remarked, "Well, Satan has taken the form here of Aaron Patterson. And by your own verdict, that there are no mitigating factors sufficient to preclude the imposition of the death penalty, you'll say be gone Satan." Defense counsel, however, failed to object to this comment, and thus we deem the issue waived. See *People v. Enoch* (1988), 122 Ill. 2d 176.

In sum, we are not persuaded that the prosecutor's comments, taken either singly or cumulatively, substantially prejudiced defendant. After careful review, the evidence in aggravation clearly outweighs the evidence in mitigation, even in the absence of such comments. Such comments did not affect the outcome here.

## VII
## Ineffective Assistance of Counsel

Relying on *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, defendant contends that he was denied the effective assistance of counsel at the suppression hearing, at trial and sentencing in violation of the sixth amendment.

Ineffective assistance of counsel is established by a showing that: (1) counsel's performance was so seriously deficient as to fall below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance so prejudiced the defense as to deny the defendant a fair trial. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *People v. Albanese* (1984), 104 Ill. 2d 504, 525.) "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *** If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, *** that course should be followed." *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; *Albanese*, 104 Ill. 2d at 527.

Defendant first argues that defense counsel did not exercise sound trial strategy because counsel allowed him to plead guilty to two unrelated felonies while awaiting trial. Defendant claims that the felony convictions consequently became aggravating factors at sentencing. Defendant qualified to receive the death penalty by virtue of his conviction of the double homicide (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3)). Defendant was also qualified to receive the death penalty because he was responsible for the actual killings which occurred in the course of a felony (Ill. Rev. Stat. 1985, ch. 38, par. 9—

1(b)(6)). Evidence pertaining to the felony charges would have been admissible in aggravation even if defendant had not been convicted of those charges, provided the evidence was reliable, relevant and subject to cross-examination. (See *Pitsonbarger*, 142 Ill. 2d at 407.) Certainly, there is no reason to believe that such evidence would be inadmissible in this case. Obviously then, the outcome would not have been different had defense counsel prevented defendant from pleading guilty to the felonies during trial. Evidence of the recent felony charges would, nonetheless, have been before the jury. Accordingly, defendant was not prejudiced.

Next, defendant argues that defense counsel did not press for the complete discovery of the additional pages of the interrogating officers' handwritten notes or take further action regarding the discrepancy in those notes which were produced. Officer Pienta testified that the police supplemental report was drawn from the officers' handwritten notes. The supplemental report in its entirety was produced and admitted into evidence. Four pages of the officers' handwritten notes were also produced, but Pienta testified that there were additional pages. The trial court considered that the State inadvertently failed to produce these additional pages. Additionally, Pienta, Marley, McWeeny, and Troy testified that defendant's confession was not coerced. Further, both defendant and Pienta testified and the supplemental report indicated that defendant received *Miranda* warnings when he was first arrested and taken to the fourth district police station and the police supplementary report confirmed this fact. Under such circumstances, we find it hard to believe that the undisclosed notes would have revealed any evidence of a determinative nature. Like the trial court, we also reject the notion that the State was implicated in wrongdoing because of the minor discrepancy between the copy of notes tendered to

the defense and the State's copy. The notation, "rights Pienta" could have been made by anyone and its existence proved nothing as well, considering the state of the evidence. Further action by defense counsel to clarify that discrepancy could hardly have affected the outcome here. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

Defendant also claims that defense counsel failed to effectively cross-examine Pienta at the suppression hearing about whether he had hit James Hill in defendant's presence. Defendant alleged that Pienta hit Hill while they were riding in the police car to the polygraph examination. On direct examination, Pienta was asked if he had hit Hill. Pienta responded that he did not know Hill and also testified in response to other questions that he, his partner and defendant were the only persons in the vehicle. Under these circumstances, defense counsel could hardly be faulted for pursuing what apparently would have been a fruitless cross-examination. Even if the failure was unsound trial strategy, it could hardly be said to be prejudicial. Pienta's credibility would not have been significantly impugned by such examination in light of his previous steadfast responses.

Defendant additionally claims that defense counsel did not: (1) arrange to have a third party listen to his telephone conversation with the medical examiner so as to provide a basis for possible impeachment at trial; (2) examine Wayne Washington about a criminal matter pending against him; or (3) raise objection to the State's failure to call all material witnesses.

At trial, defense counsel asked the medical examiner if he recalled telling defense counsel on the telephone that the victims could have been dead for 36 hours to 4 days when discovered. Because defense counsel had no way to prove up the resultant impeachment (the examiner could not recall his exact words), the question was

stricken. However, whether defense counsel successfully raised a question about when death occurred or whether the examiner was impeached did not prejudice defendant. The credibility of the examiner and the issue of the time of death was simply not critical to the case.

Testimony resulting from defense counsel's cross-examination of Washington regarding a pending weapons violation might have somewhat impugned Washington's credibility or given rise to an inference of self-interest. The absence of such testimony, however, in view of the evidence in support of guilt, did not prejudice defendant so as to deny him a fair trial.

Similarly, defendant was not prejudiced because the defense did not make objection to the State's failure to call all material witnesses as this issue was raised at trial by his other defense counsel. The trial court then had an opportunity to rule on the matter, it did, and defendant cannot be said to have been prejudiced.

Finally, defendant contends that he was prejudiced by a lack of continuity in his defense caused by the assignment of a series of different public defenders to his case. Defendant was represented during pre-trial proceedings by three different assistant public defenders and was represented at trial and the death penalty hearing by assistant public defenders Brian Dosch and Janice McGaughey. The record reveals no lack of continuity in the defense. To the contrary, it affirmatively shows that, in at least one instance, the motion to reopen the motion to suppress, an attempt was made by defense counsel to remedy a situation overlooked by prior counsel. The mere fact that more than one assistant public defender appears and represents a defendant does not establish that the defendant received ineffective assistance of counsel. (See *People v. Mitchell* (1966), 33 Ill. 2d 603, 606.) In this case, defendant has not shown more than

that fact. Defendant's argument, accordingly, lacks merit.

## VIII

### Illinois Death Penalty Statute and the Penalty of Death

Defendant raises numerous arguments against the Illinois death penalty statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) as well as the penalty of death. Defendant first argues that the statute is unconstitutional because it does not require the State to prove beyond a reasonable doubt the absence of mitigating factors sufficient to preclude the imposition of a death sentence. Defendant requests that we reconsider *People v. Kubat* (1983), 94 Ill. 2d 437, which decided this issue. (See also *People v. Thomas* (1990), 137 Ill. 2d 500, 549; *People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 408.) We therefore decline to overturn our well-established precedent.

Next, defendant argues that the statute is unconstitutional because it places the burden of persuasion on the defendant to prove that death should not be imposed. We have repeatedly rejected this argument (*Thomas*, 137 Ill. 2d at 537-38; *Pitsonbarger*, 142 Ill. 2d at 408; *People v. Williams* (1991), 147 Ill. 2d 173 (also rejecting the argument that the statute does not allow for an individualized determination that death is an appropriate punishment); *People v. Howard* (1991), 147 Ill. 2d 103) and find no persuasive reason now to reconsider the issue.

We also address defendant's argument that the statute is unconstitutional because it provides the prosecutor unguided discretion as to whether or not to seek the death penalty. While dissenting members of this court have stated their belief that the statute's provision of such prosecutorial discretion violates the eighth amendment (*People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531; *People v. Lewis* (1981), 88 Ill. 2d 129), this court

has repeatedly since held that the statute is not unconstitutional on this basis (*People v. Jackson* (1991), 145 Ill. 2d 43, 126; *Williams*, 147 Ill. 2d at 264-65; *Howard*, 147 Ill. 2d at 171-72). Accordingly, we decline to reconsider the issue.

We likewise decline to reconsider the final issue defendant raises concerning the statute, that it is unconstitutional because it does not sufficiently minimize the risk of arbitrarily and capriciously imposed death sentences. Defendant offers no arguments which this court has not already considered and rejected. (See *People v. Fields* (1990), 135 Ill. 2d 18, 75; *People v. Phillips* (1989), 127 Ill. 2d 499, 542-43; *Williams*, 147 Ill. 2d at 267-68.) Reconsideration is not warranted.

Defendant lastly contends that the penalty of death is inappropriate because the evidence against him was merely circumstantial. Defendant essentially contends that after a finding of guilt beyond a reasonable doubt, residual doubt remains in a case such as this which argues against the imposition of death. In *People v. Eyler* (1989), 133 Ill. 2d 173, however, this court rejected the argument that the death penalty is inappropriate in a circumstantial evidence case. Likewise, in this case we reject the argument. While no physical evidence was presented linking defendant to the murders here, defendant confessed to the murders and that confession was corroborated not only by Marva Hall, but by the physical evidence which showed that the victims suffered a multitude of wounds, including defense wounds, inflicted by a kitchen knife, that entry to their home was not forced, and that their premises contained guns. We cannot say based on this record that residual doubt remained in the minds of the jury so as to preclude imposition of the death penalty. The sentence is supported by the evidence deduced at both the guilt as well as the sentencing phase.

For the reasons we have stated, the judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Wednesday, March 24, 1993, as the date on which the sentence of death entered by the circuit court is to be executed. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 119—5). A certified copy of the mandate in this case shall be delivered by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein defendant is confined.

*Judgment affirmed.*